AIRCO SPEER CARBON–GRAPHITE, a division of Airco, Inc.

v.

LOCAL 502, INTERNATIONAL UNION OF ELECTRICAL, RADIO & MACHINE WORKERS OF AMERICA, AFL–CIO.

Civ. A. No. 77–114 B Erie.

United States District Court,
W. D. Pennsylvania.

July 23, 1980.

Patrick J. Berrigan, Niagara Falls, N. Y., Alvin B. Coppolo, St. Marys, Pa., for plaintiff.

Ronald L. Gilardi, Pittsburgh, Pa., Richard B. Sobol, Washington, D. C., for defendant.

## MEMORANDUM OPINION

KNOX, District Judge.

On February 1, 1980, the Court of Appeals for the Third Circuit vacated the judgment of this court, *Airco Speer Carbon-Graphite v. Local 502, etc.*, 479 F.Supp. 246 (W.D.Pa.1979), and remanded this cause for the following determination:

"What impact, if any, does the decision of the Supreme Court of the United States in the *Carbon Fuel* [*Co. v. United Mine Workers of America*, 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979)] case have on the decision of this Court which found the local union liable for the unauthorized work stoppage of May 17–25, 1977?"

A status report and argument on the merits was held on March 26, 1980, the parties subsequently filed briefs and reply briefs, and the matter is now ripe for decision.

The plaintiff, Airco Speer Carbon-Graphite, a division of Airco, Inc., brought suit basing jurisdiction upon Section 301 of the Labor Management Relations Act (LMRA),

29 U.S.C. § 185, against the defendant, Local 502, International Union of Electrical, Radio & Machine Workers of America, AFL–CIO, seeking to recover compensatory damages allegedly resulting from an illegal work stoppage or wildcat strike in violation of the collective bargaining agreement then in effect between the parties. The case was tried to the court non jury on February 20–22, 1979, and the court entered findings of fact. *Airco Speer Carbon-Graphite v. Local 502, etc., supra*, 479 F.Supp. at 249–253. From these findings, the union was held liable to the company under four independent theories. We held initially that the union breached its express and implied obligations under the terms of the collective bargaining agreement. The mass action theory, the common law of agency and the doctrine of ratification provided three additional distinct bases of liability.

In *Carbon Fuel Co. v. United Mine Workers of America, supra*, Justice Brennan, writing for a unanimous Court, announced a rule of union liability—the responsibility of unions to prevent and terminate unauthorized work stoppages in violation of a collective bargaining agreement is limited to cases when the union may be found liable under the common law of agency and ratification. A review of the procedural history of the case is instructive.

Carbon Fuel brought suit pursuant to Section 301 of the LMRA against three local unions, the district union, a regional subdivision of the UMWA, and the international union. The complaint alleged that 48 unauthorized strikes were in violation of the applicable collective bargaining agreements. The district court directed verdicts against the locals for 31 of these strikes on the basis of the mass action theory of liability. On appeal, the court affirmed, *Carbon Fuel Co. v. United Mine Workers of America*, 582 F.2d 1346 (4th Cir. 1978), and review of these judgments was not sought in the Supreme Court.[1]

The district court instructed the jury that the district and international unions must use all reasonable means available to them to prevent work stoppages or strikes from occurring in violation of the contract or to terminate any such work stoppages after they began. Verdicts were returned against the district and the international. On appeal, the court reversed, holding that the district and international had no responsibility for the strikes. The Supreme Court affirmed, rejecting the company's arguments that the obligations of the UMWA and the district to use all reasonable means to prevent and terminate unauthorized strikes in violation of the collective bargaining agreement is either implied in law because the contract contains an arbitration provision or is to be implied from the provision of the agreement that the parties "will maintain the integrity of the contract." *Carbon Fuel Co. v. United Mine Workers of America, supra*, 444 U.S. at 220, 100 S.Ct. at 415, 62 L.Ed.2d at 399. The Court expressly overruled *Eazor Express v. Teamsters*, 520 F.2d 951 (3d Cir. 1975), *cert. denied*, 424 U.S. 935, 96 S.Ct. 1149, 47 L.Ed.2d 342 (1976) wherein the Third Circuit held unions liable under a no strike clause for failure to use best efforts to end unauthorized strikes.

Local 502 contends that *Carbon Fuel* precludes a finding of union liability in this case. Union liability, defendant asserts, cannot be based upon an implied in law obligation to use all reasonable means to terminate an unlawful strike in violation of a collective bargaining agreement. Airco, on the other hand, argues that the standards of union liability announced in *Carbon Fuel* are inapplicable in this case and that a local union, by giving its no-strike pledge, must use its best efforts to terminate a wildcat strike.

In *Carbon Fuel*, the Supreme Court fashioned a rule of union liability without differentiating among local, district or inter-

---

1. The district court further held that the remaining 17 unauthorized work stoppages were sympathy strikes violative of the collective bargaining agreements. On appeal, the Court vacated the judgments against the locals under

*Buffalo Forge v. Steel Workers*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), and review of these judgments was not sought in the Supreme Court.

national unions. No such distinction is found in the statutory language of Section 301 and its legislative history relied on by the Court. While addressing only the appeals of the district and international unions, the Court clearly holds that the responsibility of *unions* to prevent and end unauthorized work stoppages arises only under the common law of agency and ratification. By expressly overruling *Eazor Express, Inc. v. Teamsters, supra, Carbon Fuel* has rejected the best efforts doctrine as a basis of recovery. Airco's contention that *Carbon Fuel* applies only to agreements containing implied no strike obligations is without merit. Both the contract in the instant case and in *Eazor Express* contain an express no-strike clause.

■ This clause is the subject of defendant's second attack upon the judgment of the court. The no strike clause of the agreement provides as follows:

"The Union will not cause or officially sanction its members to cause or take part in any strikes (including sit-downs, stay-ins, slowdowns, or any other stoppages of work) and will cooperate with the Company in every way possible to prevent any such stoppages of work and to terminate such stoppages that may occur as soon as possible. The Company agrees not to lock out any of the employes."

Defendant contends that the union did not breach the express terms of the agreement. Local 502 construes the term, "cooperate," to require no more than union compliance with reasonable company requests for action designed to end the strike. According to the company, "cooperate " means: to associate with another for mutual, often economic benefit. Memorandum of Plaintiff on Remand to District Court, at p. 20. We previously held defendant liable under the express terms of the contract for failing "to take any action during the course of and following the wildcat strike." *Airco Speer Carbon-Graphite v. Local 502, etc., supra,* 479 F.Supp. at 254. For the additional reasons stated below, we reaffirm our holding that Local 502 breached the

cooperation clause, and is therefore, liable to the plaintiff.

■ The court should interpret the words in a contract of this nature to give them their ordinary and reasonable meaning. *Penn Packing Co. v. Amalgamated Meat Cutters,* 497 F.2d 888, 891 (3d Cir. 1974), citing 3 Corbin on Contracts § 535. "[W]ith an express clause the court can determine its meaning by looking to the language of the clause, the structure of the contract, the bargaining history, and any other relevant conduct of the parties that shows their understanding of the contract." *Delaware Coca-Cola Bottling Co., Inc. v. General Teamsters Local Union 326,* 624 F.2d 1182, at 1185 (3d Cir. 1980). A union may agree to assume a greater responsibility for ending illegal strikes than that imposed by law. *United Steelworkers of America v. Lorain,* 616 F.2d 919, 922 (6th Cir. 1980).

■ We believe that the definition of "cooperate" found in Black's Law Dictionary 404 (4th ed. 1951), the act of operating or acting jointly or concurrently with another or others, supplies a reasonable meaning to the "cooperate" clause of the contract. There is no basis in the record for defendant's conclusory opinion that *all* requests for action or for cooperation must be *initiated by the company.* Rather, the express terms of the clause prohibit the union from disregarding a strike and permitting its continuance, once it has commenced, regardless of whether the union itself instigated the strike. *Cf. Latas Libby's, Inc. v. United Steelworkers of America,* 609 F.2d 25 (1st Cir. 1979). The findings of fact listed in *Airco Speer Carbon-Graphite v. Local 502, etc., supra,* 479 F.Supp. at 249–253, which we incorporate herein, clearly show that defendant, through its President, other officers, and officials failed to take any action to get the union membership back to work. When, at the outset of the strike, Airco rejected the union's demand for amnesty for all union personnel involved in the work stoppage, Local 502 officials vacated the plant and the mass picketing, which had ceased at the direction of a union steward during the settlement discus-

sions, immediately resumed. While *Carbon Fuel* holds there is no implied in law duty to take affirmative action to terminate an unlawful strike, where, as here, the parties have contracted to act jointly to end such a strike, the union must initiate some minimal efforts or take some responsive action to do so. We need not explore the limits of this obligation since the union wholly failed to do anything to terminate the work stoppage.

We next consider the union's argument that imposition of liability under the mass action theory is inappropriate in this case since Local 502, an amalgamated union which serves as the collective bargaining representative for employees of ten different companies, is analagous to a district union. In *U. S. Steel Corp. v. United Mine Workers of America*, 534 F.2d 1063 (3d Cir. 1976), the Court stated that application of the mass action theory is appropriate where "substantially all of the members of an entity act in concert." *Id.* at 1080 n. 4, and liability under this theory cannot be imposed on "a larger union entity" such as a district or international union. *Id.* at 1074. Further, according to Local 502, union members did not refuse to report to work but were prevented from doing so because access to the plant was blocked by the pickets.

■ While these arguments would be deserving of careful analysis, we believe, contrary to the views of the parties, that *Carbon Fuel* precludes a finding of union liability under the mass action theory. We agree with Judge Teitelbaum of this District that the mass action theory does not survive *Carbon Fuel,* inasmuch as the Supreme Court has clearly defined the limits of union liability under Section 301. *See Lakeshore Motor Freight Co. v. Teamsters,* 483 F.Supp. 1150, 1153 n. 1 (W.D.Pa.1980). Although review of the judgments against the local unions was not sought in the Supreme Court and the mass action theory was not discussed in the Opinion of the Court, *Carbon Fuel* limits the responsibility of unions for strikes in breach of contract to cases when the union may be found respon-

sible according to the common-law rule of agency. We conclude, therefore, that the mass action theory, a concept first articulated by Judge Goldsborough in *United States v. U.M.W.A.,* 77 F.Supp. 563 (D.C.1948), cannot form the basis of recovery in this action.

We next consider defendant's argument that the record does not support a finding of union liability under the common law rule of agency. Local 502 asserts that this court manifestly relied on the union's failure to act in holding the union liable on this basis. We disagree.

The evidence clearly shows that the acts of the union officials fell within the actual or apparent scope of the acting person's authority. Local 502's constitution provides that elected officers, including Chief Stewards, shall compose the Executive Board. One of the enumerated duties of the Chief Stewards is to see that all provisions of the contract are carried out. Shop Stewards are elected in every department of all plants and, among other duties, are required to represent the members, by whom they have been chosen, in dealings with the foremen and to report important matters affecting their groups to the Shop Committee or the union officers. Bernard Heiberger, a Shop Steward assigned to an undermining crew, directed his crew members to refuse undermining Furnace # 1407 purportedly for safety reasons which we find did not exist. His decision precipitated the walkout. At the hearing on the company's motion for a preliminary injunction in state court and in the initial stages of this suit, defendant maintained that the work stoppage was a protected safety strike. *See Gateway Coal Co. v. U. M. W.,* 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974). Chief Steward Smith learned of the undermining complaint prior to the walkout and, following his personal inspection of the furnace, neither confirmed nor denied that # 1407 was fit for undermining. Assistant Chief Steward Allshouse was observed delivering beer to the Theresia gate pickets on May 20, 1977, and Shop Steward Bennett joined the first shift employees on the picket lines on the evening of May 17, 1977.

Having creating the Steward's power, the Local must take the responsibility if it is wrongly used. The absence of a union policy supporting the actions taken by the Stewards against the plaintiff is inconclusive. There is something shown by the fact that different people holding the office of Steward gave the same kind of orders and indulged in the same kind of conduct. This is good circumstantial evidence to show that these actions were within the general scope of authority notwithstanding the fact that the Stewards were not empowered to call a strike. Moreover, we could properly draw an adverse inference from the union's failure to call any of the Stewards or any other person as witnesses. *N. L. R. B. v. Local 815, International Brotherhood of Teamsters, Chauffers, Warehousemen and Helpers of America, Independent*, 290 F.2d 99 (2d Cir. 1961). *See also* the discussion in *Airco Speer Carbon-Graphite v. Local 502, etc., supra*, 479 F.Supp. at 255.

The Third Circuit has suggested that the union steward is in a position of agency comparable to that of the employer's foreman. *N. L. R. B. v. Brewery & Beer Distributor Drivers, etc.*, 281 F.2d 319, 321–322 (3d Cir. 1960). Certainly a union is not responsible for every act of a steward, simply by virtue of his position, but where, as here, the conduct falls within the apparent or actual authority of the steward, defendant is liable to the company under the common law of agency. In short, the actions of these union officials constitute sufficient inducement, encouragement and condonation of the strike to expose the union to damages.[2]

Finally, defendant argues, that liability cannot be imposed on the basis of union inaction under the doctrine of ratification. Defendant has attempted to blur the distinction between the discredited best efforts theory and the doctrine of ratification expressly made available to the parties

to a breach of contract suit pursuant to Section 301(a) and (e). Defendant's assertion that a union cannot be held liable for its failure to act under the doctrine of ratification finds no support in *Carbon Fuel* or any other decision of the Court. *See e. g. United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

It is hornbook law that the acts of an agent can be ratified by inaction which manifests consent and there are cases in which the result rests wholly upon a finding of fact that the failure to take action indicated the consent necessary for ratification. Seavey, Agency § 37; *Gregory v. Fassett*, 178 Pa.Super. 599, 116 A.2d 304 (1955). See also Restatement (Second) of Agency § 94 (1957): *"Failure to Act as Affirmance.* An affirmance of an unauthorized transaction can be inferred from a failure to repudiate it. A principal manifests his consent by doing nothing after learning of an unauthorized act, when the failure to take action is evidence of a willingness to become a party to the action."* The period during which the inaction lasted, the difficulty in communicating dissent, the loss which might result from failure to act promptly, are all relevant since ratification depends upon consent in fact and not upon whether a reasonable person would give consent. Seavey, Agency § 37.

The behavior of the President of Local 502 alone is sufficient to impute to the union "forgiveness" of the strike. Not only did he cut off negotiations when Airco refused his demand to grant amnesty for the instigators, he failed to disavow or censure the actions of the striking union members. Bail bonds for eighteen arrested pickets, which were authorized by the Union Executive Board, were signed by either the President or the Treasurer of Local 502. Defendant's reliance on *United Steelworkers of America v. Lorain, supra*, in support of its contention that the union's failure to

---

**2.** Although Local 502 Stewards are not elected by the total membership of the union, the principal in this agency relationship is the union since it provides the source of the Stewards' authority. That the recipient of the authority is named by someone other than its creator does not negate the agency's existence. *N. L. R. B. v. International Longshoremen's & Warehousemen's Union, Local 10*, 283 F.2d 558, 564 (9th Cir. 1960).

discipline the instigators was not evidence of ratification is misplaced. In *Lorain*, the court found that disciplinary measures were both legally and practically unavailable to the union during the course of the strike. There is no such evidence in this case, defendant having chosen to forego calling witnesses or producing any evidence bearing upon this issue. Even assuming that the actions of the Stewards, in leading the walkout and picketing, were outside the scope of their authority, the facts clearly show that the union condoned the illegal strike, through its inaction.

Defendant's remaining contentions pertain to damages and have either been addressed in our prior opinion or are without merit. An appropriate order will be entered.