444 So.2d 465 (1984)
DADE COUNTY POLICE BENEVOLENT ASSOCIATION, Appellant,
v.
CITY OF HOMESTEAD and the Public Employees Relations Commission, Appellees.
No. 81-2023.
District Court of Appeal of Florida, Third District.
January 3, 1984.
*466 Donald D. Slesnick, II, Coral Gables, for appellant.
Thomas W. Young, III, Tallahassee, for appellees.
*467 Before NESBITT, FERGUSON and JORGENSON, JJ.
JORGENSON, Judge.
The Dade County Police Benevolent Association [the PBA] appeals that portion of a Florida Public Employees Relations Commission [PERC] order which assessed damages and attorney's fees against the PBA following a wildcat strike by City of Homestead police officers. In entering its order PERC rejected in part a PERC hearing officer's recommended order which dismissed the at-issue unfair labor practice charge against the PBA. For the reasons which follow we reverse the appealed portion of the PERC order and remand with directions to adopt the hearing officer's recommended order of dismissal.

I
The essential facts as found by the hearing officer are: Sergeant Nick Tauriello was elected by the Homestead police officers as their representative to the PBA during 1980 Homestead police contract negotiations. Tauriello performed the liaison role of communicating with the Homestead officers during the negotiations, calling meetings of the Homestead officers as he deemed it necessary. Tauriello did not attend meetings of the PBA Board of Directors. Sharon Dranow, a PBA employee, represented the PBA in the contract negotiations. These negotiations resulted in an impasse in July and a special master was appointed.
Early in the week of Monday, October 20, Tauriello was quoted in the press as having said, "The mood of the officers right now is that they're going to get sick, blue flu or whatever you want to call it." Nearly the entire Homestead police force was present at a shop meeting held the evening of Wednesday, October 22, as were Dranow, PBA President Hugh Peebles and PBA counsel Don Slesnick. Dranow, Peebles and Slesnick tried to talk the Homestead officers out of a walkout. Peebles explained that a walkout would be totally illegal and that under no circumstances would the PBA support such a walkout. The Homestead officers were visibly in disagreement and upset with Dranow, Peebles and Slesnick's position. Peebles did not believe that they had dissuaded the Homestead officers from a walkout and related this to news reporters after he, Dranow and Slesnick left the meeting. Meanwhile, Tauriello quieted the officers down and took a vote. The vote was unanimous: the officers would walk out on Friday, October 24.
On Thursday, October 23, Slesnick telephoned Tauriello and urged him to beg the officers not to go on strike. The officers met that afternoon and voted unanimously to put off the walkout until Monday, October 27, following the Homestead City Council impasse resolution meeting, and to decide then what to do. On the evening of Thursday, October 23, Tauriello attended, unexpectedly, his first PBA Board of Directors meeting. Tauriello attended because, like most of the Homestead officers, he believed that the PBA would support a walkout. Peebles read a memorandum addressed from him to Tauriello expressing the same position Peebles had stated the previous night. The PBA Board of Directors voted unanimously, in Tauriello's presence, not to support a walkout, and Tauriello relayed this information to the Homestead officers. Later that evening Slesnick telephoned Tauriello and during the course of an hour repeatedly explained that a walkout would be wrong.
On Monday, October 27, the Homestead City Council voted to accept the special master's recommended contract. Tauriello and those Homestead officers who were present walked out of the City Council meeting en masse and began picketing in front of the Homestead City Hall. Peebles, while watching the picketers, saw what he believed to be an on-duty officer join them. Peebles told Tauriello to direct any on-duty officers to return to work. Tauriello refused and was immediately removed from his position as PBA representative. After being enjoined by a court order from striking, the officers returned *468 to work. They subsequently entered into a stipulated order regarding their discipline which is not here appealed.

II
In determining whether the PBA had supported the Homestead police officers' strike and had thereby violated sections 447.501(2)(e) and 447.505, Florida Statutes (1979),[1] the hearing officer applied common-law principles of agency. This agency analysis was used in the seminal case of Carbon Fuel Co. v. United Mine Workers of America, 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979), see, e.g., Case Note, 8 Fla.St.U.L.Rev. 565 (1980), interpreting section 301 of the Labor Management Relations (Taft-Hartley) Act, 29 U.S.C. § 185 (1976), to determine union responsibility for wildcat strikes in the private sector, and was approved and adopted by PERC in Dade County School Board v. Dade County School Maintenance Employees Committee, 6 Fla.Pub.Empl.Rep. (Lab.Rel.Press) ¶ 11109 (Fla. PERC Apr. 30, 1980). As the hearing officer explained in his recommended order, Carbon Fuel Co. places upon the charging party the burden of proving union support for a wildcat strike. No obligation is placed upon the union to use all reasonable means to end an unauthorized strike and, therefore, though showing that its best efforts were used to end a strike might constitute a persuasive defense, a union does not bear the burden of disproving its support for the unauthorized strike. See City of Homestead v. Dade County Police Benevolent Association, 7 Fla.Pub.Empl.Rep. (Lab.Rel. Press) ¶ 12347, at 733 (Fla. PERC Aug. 21, 1981).
A reading of Carbon Fuel Co. reveals that the common-law agency test used in that case was adopted so "that to find [a] union liable `it must be clearly shown ... that what was done was done by their agents in accordance with their fundamental agreement of association'," Carbon Fuel Co., 444 U.S. at 217, 100 S.Ct. at 414, 62 L.Ed.2d at 399 (quoting Coronado Coal Co. v. United Mine Workers of America, 268 U.S. 295, 304, 45 S.Ct. 551, 554, 69 L.Ed. 963, 968 (1925)). The common-law agency test of section 301 replaced the "very loose" responsibility test of the National Labor Relations Act of 1935, under which the term "employer" included "any person acting in the interest of an employer," Carbon Fuel Co., 444 U.S. at 217, 100 S.Ct. at 414, 62 L.Ed.2d at 399. Quoting in part from the lower court's opinion, the Court in Carbon Fuel Co. concluded that "`[t]here was no evidence presented in the district court that [the union] instigated, supported, ratified, or encouraged any of the work stoppages... .' [Citation omitted.] ... the local unions lacked authority to strike without authorization from [the union]. [Citation omitted.] Moreover, [the union] had repeatedly expressed its opposition to wildcat strikes. Petitioner thus failed to prove agency ...," id. at 218, 100 S.Ct. at 414, 62 L.Ed.2d at 400.
Applying these common-law principles of agency, the hearing officer below wrote:
The City seeks to show that the Dade County PBA supported the strike by Homestead PBA bargaining unit members by demonstrating that the actions of Sergeant Nick Tauriello, who admittedly participated in and supported the strike, bind the Dade County PBA because of Tauriello's official status as the elected representative for the Homestead PBA bargaining unit members in Homestead *469 contract negotiations (see City's Proposed Order at 19-20). The City further argues that even if Tauriello's official status did not bind the Dade County PBA, the efforts of PBA President Hugh Peebles, PBA counsel Donald D. Slesnick, II, and PBA employee and negotiator Sharon Dranow to repudiate Tauriello's actions and end the strike were so minimal as to lead to the inference that the Dade County PBA supported the strike.
To the contrary, I conclude that while prior to the week beginning Monday, October 20, it might have been reasonable for members of the Homestead PBA bargaining unit to believe that Tauriello's actions represented the views of the Dade County PBA because of his official status, they were well aware during the week before they walked out on October 27 that Tauriello represented their views, and not the opposing view of the Dade County PBA. I further conclude that the actions of Peebles, Slesnick, and Dranow made it unreasonable for Homestead PBA bargaining unit members to believe that their walkout represented the views of the Dade County PBA. The following paragraphs will enumerate the factual grounds for my conclusions in this regard.
City of Homestead at 734.
The hearing officer then reviewed the evidence upon which he based his finding of fact that Tauriello was not acting as an agent of the PBA when he instigated the wildcat strike. See id. at 734-35.[2]

*470 III
In its final order, PERC stated that the hearing officer's findings of fact were supported by competent substantial evidence, that the proceedings upon which the findings were based comported with the essential requirements of law and then expressly adopted the hearing officer's findings of fact as its own. PERC added, however, that it was "in substantial disagreement with the Hearing Officer's ultimate finding regarding agency," City of Homestead at 722. PERC felt that the hearing officer had applied the wrong standard of proof of agency and that the correct standard could be found in Sunset Line & Twine Co., 79 N.L.R.B. 1487 (1948).
The "ordinary law of agency" mandated by Sunset Line & Twine Co. was expressed in that National Labor Relations Board order and quoted in the PERC order below as follows:
1. The burden of proof is on the party asserting an agency relationship, both as to the existence of the relationship and as to the nature and extent of the agent's authority. (Citation omitted.) In this case, for example, it was incumbent upon the General Counsel to prove, not only that the acts of restraint and coercion alleged in the complaint were committed, but also that those acts were committed by agents of the Respondent Unions, acting in their representative capacity. The Respondents' failure to introduce evidence negating the imputations in the complaint did not relieve the General Counsel of that burden.
2. Agency is a contractual relationship deriving from the mutual consent of principal and agent that the agent shall act for the principal. But the principal's consent, technically called authorization or ratification, may be manifested by conduct, sometimes even passive acquiescence as well as by words. Authority to act as agent in a given manner will be implied whenever the conduct of the principal is such as to show that he actually intended to confer that authority. (Citation omitted.)
3. A principal may be responsible for the act of his agent within the scope of the agent's general authority, or the `scope of his employment' if the agent is a servant, even though the principal has not specifically authorized or indeed may have specifically forbidden the act in question. It is enough if the principal actually empowered the agent to represent him in the general area within which the agent acted. (Citation omitted.)
City of Homestead at 723 (quoting Sunset Line & Twine Co.).
PERC cited Shimman v. Frank, 625 F.2d 80 (6th Cir.1980), and Barton Brands, Ltd. v. NLRB, 529 F.2d 793 (7th Cir.1976), *471 as further examples of federal court approval of the Sunset Line & Twine Co. test. Barton Brands, Ltd., of course, predates Carbon Fuel Co., but a reading of Shimman reveals that the agency test there approved is in actuality that of Carbon Fuel Co. It may be inferred from this that PERC was suggesting that the agency tests of Sunset Line & Twine Co. and Carbon Fuel Co. are the same. Such a suggestion by PERC would not be ill-founded, for the "two" tests are but one: the common-law test of agency. In applying the test, PERC evidently chose to emphasize in its order certain facets of the test more heavily than others.
Noting that agency is a question of fact to be determined by the trier of fact, see City of Homestead at 724 n. 3 (citing Cleveland Compania Maritima, S.A. Panama v. Logothetis, 378 So.2d 1336 (Fla.2d DCA 1980)), PERC retraced in its final order the hearing officer's findings of fact, reweighing them, and concluded that in calling for the strike by the Homestead police officers, Tauriello was acting as the agent of the PBA, see id. at 724.
This conclusion does not turn on an analysis of whether Tauriello's strike activity was specifically or generally authorized by the PBA. There is no record evidence that Tauriello was directed to prepare for the conduct of a strike by any PBA officials. To the contrary, the PBA Board of Directors specifically rejected Tauriello's request for support of the walk out on October 24. Rather, the conclusion turns on the basic proposition of agency law that the principal is liable for the acts of the agent within the scope of the agent's general authority "even though the principal has not specifically authorized or indeed may have specifically forbidden the act in question." The most effective way to terminate such liability is to terminate the agency relationship as soon as it becomes evident that the agent intends to persist in a course of conduct which is contrary to the best interest of the principal. It may be fruitless to speculate, but it is at least arguable that immediate PBA action to remove Tauriello as PBA membership representative may have squelched the incipient job action by depriving the chief Homestead strike advocate of his official leadership position; the record is clear that the strike lasted only twenty-six hours after Tauriello's removal. We perceive that the removal of Tauriello effectively dissociated the PBA from the strike from that point forward.
Id.

IV
While approving the "ordinary law of agency" criteria embraced by Sunset Line & Twine Co., PERC noted that agency is a question of fact to be determined by the trier of fact. PERC, nonetheless, reweighed the facts and determined that Tauriello was acting as an agent of the PBA, but offered no justifiable rationale for its conclusion. The record in this case is replete with overwhelming evidence that Tauriello exceeded his authority and that the PBA had put Tauriello and the other Homestead officers on notice that the PBA would neither endorse nor sanction a strike, a conclusion reached by the hearing officer.
The existence and scope of an agency relationship is a question of fact to be determined by the trier of fact. Smith v. Texas Co., 111 Fla. 762, 149 So. 585 (1933); Standard Oil Co. v. Nickerson, 103 Fla. 701, 138 So. 55 (1931); Watkins v. Sims, 81 Fla. 730, 88 So. 764 (1921); Scott v. Sun Bank of Volusia County, 408 So.2d 591 (Fla. 5th DCA 1981); Cleveland Compania Maritima, S.A. Panama; Latin American Shipping Co. v. Pan American Trading Corp., 363 So.2d 578 (Fla. 3d DCA 1978); Bernstein v. Dwork, 320 So.2d 472 (Fla. 3d DCA 1975), cert. denied mem., 336 So.2d 599 (Fla. 1976); Amerven, Inc. v. Abbadie, 238 So.2d 321 (Fla. 3d DCA 1970); Financial Fire & Casualty Co. v. Southmost Vegetable Cooperative Association, 212 So.2d 69 (Fla. 3d DCA), cert. denied mem., 219 So.2d 701 (Fla. 1968); City of Homestead; see Silver Sand Co. of Leesburg *472 v. Department of Revenue, 365 So.2d 1090 (Fla. 1st DCA 1979).
If the existence and scope of an agency relationship is susceptible of ordinary methods of proof, the hearing officer's findings of fact are binding upon the agency absent agency determination, with particularity, that the findings of fact are not based upon competent substantial evidence or are the product of proceedings not comporting with the essential requirements of law, see Venetian Shores Home & Property Owners v. Ruzakawski, 336 So.2d 399 (Fla. 3d DCA 1976); Bolinger v. Division of Retirement, State Department of Administration, 335 So.2d 568 (Fla. 1st DCA 1976); § 120.57(1)(b)9, Fla. Stat. (1979). In its order below, PERC stated that the hearing officer's findings of fact were supported by competent substantial evidence and that the evidentiary proceedings comported with the essential requirements of law. PERC, therefore, was without authority to disturb the hearing officer's findings of fact unless it can be determined that PERC concluded and then explained in its order that the existence and scope of agency is a matter of fact blurring into opinion infused with policy considerations involving special insight by PERC and is not susceptible of ordinary methods of proof before the trier of fact, the hearing officer. See McDonald v. Department of Banking & Finance, 346 So.2d 569 (Fla. 1st DCA 1977).[3] "The Department may *473 not characterize findings of fact as legal conclusions so that it may avoid the requirements of [section 120.57(1)(b)9, Florida Statutes (1979)]." Silver Sand Co. of Leesburg at 1093.

V
Nothing in the PERC order below indicates special commission insight into the determination of the existence and scope of an agency relationship. The hearing officer found that when Tauriello instigated the Homestead police officers' strike he was not acting, under the facts involved, as an agent of the PBA. Indeed, the record below suggests that Tauriello's role on behalf of the PBA was extremely limited. He was not selected by the PBA to participate in the negotiating sessions. He was selected by the officers who ultimately struck. His duties insofar as the PBA was concerned were limited to providing accurate information regarding representations made by the City of Homestead at the bargaining table and keeping the Homestead officers informed with respect to the status of negotiations. He was not an officer or director of the PBA, nor was he on the PBA payroll insofar as this record reflects. Had the PBA selected Tauriello our views with respect to PERC's determination of agency would perhaps be different.
PERC may not modify or reject the hearing officer's findings of fact unless it first determines from a review of the complete record and states with particularity in the order that the findings of fact were not based upon competent substantial evidence. Pasco County School Board v. Florida Public Employees Relations Commission, 353 So.2d 108 (Fla. 1st DCA 1977). PERC states that its determination of PBA liability "does not turn on an analysis of whether Tauriello's strike activity was specifically or generally authorized by the PBA [but] [r]ather, the conclusion turns on the basic proposition of *474 agency law that the principal is liable for the acts of the agent within the scope of the agent's general authority ...," City of Homestead at 724 (emphasis added). This seemingly contradictory statement appears to be an application of the third portion of the Sunset Line & Twine Co. test. It ignores the remainder of that test, the common-law test of agency. Assuming we are dealing with general authority conferred upon a shop bargaining representative to instigate an illegal strike, see art. I, § 6, Fla. Const. (1968), it must at least be shown that the PBA intended by word or deed to confer such general authority, even if not in the specific instance involved, see Sunset Line & Twine Co.; City of Homestead at 723. There is nothing in the record to indicate that shop bargaining representatives, or Tauriello, had within the scope of their general authority the power to call strikes, or that the PBA in any way intended to confer such illegal power. All evidence, as weighed by the hearing officer, is to the contrary.
PERC suggests that public policy demands that the PBA be found strictly liable for Tauriello's actions: labor organizations should "exercise stringent control over their agents" to prevent their participation in unlawful strikes. See id. at 724. Nothing in the evidence, as weighed by the hearing officer, suggests that the PBA did otherwise. Indeed, the record demonstrates that the actions of Dranow, Peebles and Slesnick, as found by the hearing officer, support only the view that the PBA through its authorized agents acted consistently with the conduct one would expect of responsible union officials. Tauriello was reprimanded for threatening a strike, he was enlightened by the PBA as to the consequences and, thereafter, refrained from calling the strike. When he later did call a strike, his first illegal act, he was immediately relieved of his representative status with the PBA. As PERC states, "The most effective way to terminate such liability is to terminate the agency relationship as soon as it becomes evident that the agent intends to persist in a course of conduct which is contrary to the best interest of the principal," id. This the PBA did. Tauriello was terminated the moment it became evident on-duty police officers were participating in the picket line. As PERC aptly points out, it is "fruitless" to speculate whether firing Tauriello before he persisted in calling the strike would have prevented the strike. Firing Tauriello did not end the strike, a court order did.
Fixing blame in a labor dispute, never an easy task, is uniquely a PERC responsibility. That responsibility, however, must be exercised in a manner consistent with established legal principles.[4]
Reversed and remanded with directions to adopt the hearing officer's recommended order of dismissal.[5]
NESBITT, Judge (dissenting):
I respectfully dissent.
This case presents a public interest question concerning the extent to which a public employee may circumvent the constitutional prohibition of the right to strike before the union for which he acts will be held responsible. Adopting the very facts utilized by the hearing officer, the PERC concluded that the union was liable for the acts of its representative. Because I find that the commission was entitled to displace the hearing officer's erroneous interpretation of the law of agency, I would affirm.
The facts as found by the hearing officer and adopted by the PERC included the following:
*475 1. Sergeant Tauriello was elected as the representative of the Homestead PBA bargaining unit and participated on the Dade County PBA bargaining team during all 1980 contract negotiations.
2. Tauriello functioned as a shop steward.
3. He performed the liaison role of communicating with the bargaining unit members during negotiations.
4. Tauriello had authority to call bargaining meetings and did in fact call such meetings.
5. City officials contacted Tauriello directly concerning the salary proposal.
6. The PBA attorney utilized Tauriello as a conduit through which he sent messages to the union members.
7. Ultimately, Tauriello was the one who took the strike vote.

The Hearing Officer's Findings
Based on the facts and supposedly applying the common law principle of agency, the hearing officer formulated the relevant inquiry to be whether it was reasonable for other employees to believe that the actions of Tauriello represented the views of the PBA. Citing a number of efforts on the part of the PBA president, attorney and board of directors to dissuade Tauriello and the others from striking, the hearing officer readily concluded that members could not infer that the PBA supported the strike. I have no difficulty with this particular conclusion. The problem in my view is that the wrong question was being asked. The question should have been:
Was Tauriello acting within the scope of his general authority?
This inquiry is formulated out of the common law principles of agency as enunciated in a long line of cases. More specifically, in the landmark decision of International Longshoremen's and Warehousemen's Union, CIO, Local 6 (Sunset Line and Twine Co.), 79 NLRB 1487, 23 LRRM 1001, 1005 (1948), it was stated:
A principal may be responsible for the act of his agent within the scope of the agent's general authority, or the `scope of his employment' if the agent is a servant, even though the principal has not specifically authorized or indeed may have specifically forbidden the act in question. It is enough if the principal actually empowered the agent to represent him in the general area within which the agent acted.
See also Carbon Fuel Co. v. United Mine Workers of America, 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979); Shimman v. Frank, 625 F.2d 80 (6th Cir.1980); Barton Brands Ltd. v. National Labor Relations Board, 529 F.2d 793, 799 (7th Cir.1976). In Airco Speer Carbon-Graphite v. Local 502, International Union of Electrical, Radio & Machine Workers of America, AFL-CIO, 494 F. Supp. 872, 877 (W.D.Pa. 1980), aff'd, 649 F.2d 858 (3d Cir.1981), the court stated:
Certainly a union is not responsible for every act of a steward, simply by virtue of his position, but where, as here, the conduct falls within the apparent or actual authority of the steward, defendant is liable to the company under the common law of agency.
Applying these principles, the court, in Shimman v. Frank, held that the local union was responsible for the action of its vice president in encouraging other union members to assault a dissent member, and for its business manager's acquiescence in the vice president's activities. This was within the scope of the vice president's and business manager's general authority even though the specified illegal act was not authorized.

The Commission's Review
In line with these decisions, the PERC found that the hearing officer applied the wrong standard of proof to the facts. It determined the proper inquiry to be whether Tauriello was acting within the scope of his general authority. Reciting the facts as found by the hearing officer and applying them to the correct principles of agency, the PERC concluded that Tauriello was *476 the PBA membership representative acting under the general authority of the PBA during the critical period prior to the strike. Even the circumstances of Tauriello's removal indicate that the PBA considered Tauriello to be an agent of the PBA. The PBA president ordered Tauriello to direct the men back to work. This only serves to reinforce the fact that he was clothed with the general authority to act on behalf of the PBA.
Furthermore, the efforts of the PBA officials to dissuade the officers from striking do not avoid the PBA's liability.[1] As the court observed in Consolidation Coal Co. v. Local 1707 United Mine Workers of America, 709 F.2d 882 (4th Cir.1983), an attempt may not be enough.
A local union's inaction in the face of an illegal work stoppage by all of its members may constitute ratification of the work stoppage "where the union's efforts to return strikers are so minimal that the union's approval or encouragement may be inferred." United States Steel Corp. v. UMWA, 598 F.2d 363 (5th Cir.1979) at 365; Airco Speer Carbon-Graphite v. Local 502, International Union of Electrical Radio and Machine Workers of America, 494 F. Supp. 872 (W.D.Pa. 1980).
709 F.2d at 886. See also Shimman v. Frank at 97. The effort put forth by the officials here may also be described as minimal. Despite Tauriello's advance announcement of his intent to lead the policeman out on strike, which intention was never recanted, the PBA officials permitted Tauriello to pursue his avowed course.
Since it is clear from the foregoing that the commission's disagreement was not with the facts, but rather was with the hearing officer's interpretation of the principles of common law agency, there can be no doubt that it was entitled to displace the officer's conclusion. In City of Clearwater v. Lewis, 404 So.2d 1156 (Fla. 2d DCA 1981), the commission concurred in the hearing officer's findings of fact but disagreed with his finding that under those facts a waiver had occurred. The court held that "[t]o the extent that the determination of whether a waiver occurred could be considered to be a question of fact, it is the kind of factual issue on which an agency has more discretion to overrule a hearing examiner in the implementation of agency policy." 404 So.2d at 1162. Similarly, in the present case, the question of agency is one which the PERC has greater discretion in overruling, since it intimately involves a question of policy. Therefore, the commission was entitled to substitute its conclusion for that of the hearing officer.
For the same reason, this court, on review of the commission's ruling, must give deference to the PERC in recognition of their competence in dealing with labor problems. As the first district stated, in Pasco County School Board v. Florida Public Employees Relations Commission, 353 So.2d 108, 116 (Fla. 1st DCA 1978):
Expert tribunals are entitled to the greatest deference in recognition of their special competence in dealing with labor problems. In many areas their evaluation of the competing interests of employer-employee should unquestionably be given conclusive effect in determining the application of the pertinent sections of the Act.
And, in McDonald v. Dept. of Banking & Finance, 346 So.2d 569 (Fla. 1st DCA 1977), the court distinguished a hearing officer's finding with respect to the credibility of a witness from findings made in a case such as the one before us:
At the other end of the scale, where the ultimate facts are increasingly matters of opinion and opinions are increasingly infused by policy considerations for which the agency has special responsibility, a reviewing court will give correspondingly less weight to the hearing officer's findings in determining the substantiality of evidence supporting the agency's substituted findings.
*477 346 So.2d at 579. It cannot be emphasized enough that the commission followed the hearing officer's findings of fact but disagreed with him because of his erroneous interpretation of the law of agency. It is not this court's province to displace an agency's choice between two conflicting views, Pasco at 116, and accordingly, I would decline to do so.
The result reached by the PERC is consistent with the constitutional prohibition against the right to strike. Admittedly, the organic law gives public bodies an advantage in collective bargaining. Nonetheless, this high statement of the public purpose has been placed there with the specific intent of assuring the performance for necessary public services. As difficult as it may sometimes be to public employees, their bargaining agents as well as officials representing public bodies are bound to observe it in good faith. The PERC in their order recognized this when it stated:
We must also ensure that the constitutional prohibition against strikes by public employees is not circumvented by those who, through the sanction of our certification, have been placed in a position of leadership. We therefore consider it appropriate for certified employee organizations to either restrain their agents from strike activity or answer for the resulting damages. It is obvious to any student of labor relations that the strike prohibition could easily be circumvented if unions were permitted to avoid liability for strike activity by union agents on the grounds that the activity was "unauthorized."
Based on the foregoing, I would affirm the order under review as well as the compensatory damage award.
NOTES
[1] Section 447.501(2)(e), Florida Statutes (1979), provides:

A public employee organization or anyone acting in its behalf or its officers, representatives, agents, or members are prohibited from:
... .
Participating in a strike against the public employer by instigating or supporting, in any positive manner, a strike. Any violation of this paragraph shall subject the violator to the penalties provided in this part.
Section 447.505, Florida Statutes (1979), provides: "No public employee or employee organization may participate in a strike against a public employer by instigating or supporting, in any manner, a strike. Any violation of this section shall subject the violator to the penalties provided in this part."
[2] The hearing officer's findings regarding agency:

First, Tauriello's role in negotiations reveals that his authority came primarily from his detailed knowledge of how contract proposals would affect bargaining unit members, and from his long experience and the respect he earned doing his job as a police officer on the scene in Homestead. Sharon Dranow's authority, on the other hand, emanated from her position as an outsider sent in with information and support. Tauriello's base of authority was local, and Dranow's was from downtown, in both a geographical and an organizational sense. Although Tauriello may have had some claim to attend Dade County PBA Board of Directors meetings from Homestead, he did not care to attend and never attended until the night of October 23, when he sought to persuade the Board to overrule the anti-walkout position taken by President Peebles the night before in Homestead. The record does not support a conclusion that Tauriello had unilateral authority to agree to contract proposals without approval from Dranow or other Dade County PBA officials; there are more indications that Dranow and other Dade County PBA officials had a greater voice than Tauriello. Tauriello was not directly involved with the center of power in the larger organization of the Dade County PBA.
Second, when intense conflict was generated between Dade County PBA officials and the Homestead PBA bargaining unit members at the meeting on Wednesday, October 22, Tauriello's actions identified him with the members of the local bargaining unit. The strike vote taken at that meeting was a decision to reject the leadership offered by Peebles, Dranow, and Slesnick, and Tauriello was not identified with them. In the context of this emotional rejection of his leadership, Peebles' statement to the press immediately following the meeting would not have been interpreted by Homestead PBA bargaining unit members as support for Tauriello or for the planned walkout.
Third, Slesnick's numerous telephone calls to Tauriello, Mayor Nick Sincore, and City Manager Alex Muxo following the Wednesday night meeting played a major role in averting the walkout then planned for Friday, October 24. These telephone calls continued to place Slesnick in opposition to Tauriello's position, as did Slesnick's later discussion with Tauriello concerning a Public Employees Relations Commission order in which the Commission proposed that City of Hollywood police officers be dismissed for engaging in a strike.
Fourth, Tauriello's attendance at the Dade County PBA Board of Directors meeting on Thursday night, October 23, indicated that he was not in touch with the feeling of that group, and resulted in a defeat for his attempt to persuade the Board to overrule Peebles and back a walkout in Homestead. Slesnick's phone call to Tauriello following the meeting further underscored the division between Tauriello and the Dade County PBA on the walkout question. Tauriello continued to believe that Peebles and the Dade County PBA were wrong in their judgment that a walkout would cause the loss of citizen support for the position of the Homestead PBA bargaining unit; Tauriello's belief in this regard emphasizes that his continued participation in plans for the walkout was based not on his estimation of support from the Dade County PBA, but on his relationship with the local community, a relationship which gave him confidence that Homestead PBA bargaining unit members could walk out without the support of the Dade County PBA.
Fifth, memos from Peebles during the week following the strike vote on Wednesday, October 22, while often only memorializing a position already stated to Tauriello or City representatives, cannot be interpreted as support for a walkout, particularly against the background of the position he expressed at the Wednesday night meeting in Homestead and the Thursday Dade County PBA Board of Directors meeting.
Sixth, the immediate circumstances of the walkout and Peebles' removal of Tauriello from his official status as the elected representative for the Homestead PBA bargaining unit would not have led Homestead PBA bargaining unit members to infer that Peebles supported the walkout. An interpretation far more consistent with events of the prior week is that Peebles perceived himself to be in a position too weak to bring about an immediate end to the walkout once it happened. The fact that he did not personally direct PBA members to return to work, and that he did not seek out Steve Garrison to ask him to do so, indicates only that he did not do everything he might have done. The effectiveness of these hypothetical actions appears doubtful in light of the fact that following Peebles' removal of Tauriello, the officers who had walked out promptly re-elected Tauriello as their spokesman, and in light of the further fact that Peebles' efforts to appoint a replacement for Tauriello prompted Officer Trussell's resignation from the PBA.
In summary, it would not have been reasonable for members of the Homestead PBA bargaining unit who walked off the job on October 27 and 28 to believe that their walkout, or Tauriello's participation in it, was supported by the Dade County PBA.
City of Homestead at 734-35.
[3] A survey of the case law indicates that those issues of fact that have been found to be susceptible of a hearing officer's finding of fact run the gamut of complexity, opinion and apparent infusement with policy consideration. See, e.g., Mitchell v. Department of Health & Rehabilitative Servs., 439 So.2d 943 (Fla. 1st DCA 1983) (whether services rendered at an adult congregate living facility were nursing services or of a personal nature); Salz v. Department of Administration, Div. of Retirement, 432 So.2d 1376 (Fla. 3d DCA 1983) (whether agency's mistaken belief that school was a public school could provide basis to estop agency from denying teacher retirement credit); Woodward v. Department of Professional Regulation, Bd. of Funeral Directors & Embalmers, 432 So.2d 146 (Fla. 1st DCA 1983) (whether licensees knowingly employed unlicensed persons in the practice of funeral directing); Aquino v. Department of Professional Regulation, 430 So.2d 598 (Fla. 4th DCA 1983) (whether sufficient time had passed to overcome past illicit behavior of applicant for real estate salesman's license); Brevard County Sheriff's Dep't v. Florida Comm'n on Human Relations, 429 So.2d 1235 (Fla. 5th DCA 1983) (whether termination of handicapped police officer was unlawful employment practice); Wash & Dry Vending Co. v. State, Dep't of Business Regulation, Div. of Alcoholic Beverages & Tobacco, 429 So.2d 790 (Fla. 3d DCA 1983) (whether applicants for cigarette vending machine license of "good moral character"); Glover v. Sanford Child Care, Inc., 429 So.2d 91 (Fla. 5th DCA 1983) (whether misconduct disqualified employee from entitlement to unemployment compensation benefits); Leapley v. Board of Regents, Fla. State Univ. Sys., 423 So.2d 431 (Fla. 1st DCA 1982) (whether university employee member of one bargaining unit or another); Vogel v. Palm Beach Newspapers, Inc., 423 So.2d 413 (Fla. 4th DCA 1982) (whether misconduct disqualified employee from entitlement to unemployment compensation benefits); City of Umatilla v. Public Employees Relations Comm'n, 422 So.2d 905 (Fla. 5th DCA 1982) (whether police officer was suspended for engaging in protected union activity), review denied mem., 430 So.2d 452 (Fla. 1983); Bekiempis v. Department of Professional Regulation, 421 So.2d 693 (Fla. 2d DCA 1982) (whether administrative complaints against real estate broker should be dismissed); Westchester Gen. Hosp. v. Department of Health & Rehabilitative Servs., 419 So.2d 705 (Fla. 1st DCA 1982) (cause of delays in hospital construction project and whether hospital reasonably diligent in its construction efforts so as to be grandfathered in and avoid need to comply with new certificate of need statute); Rolling Oaks Utils., Inc. v. Public Serv. Comm'n, 418 So.2d 356 (Fla. 1st DCA 1982) (whether switch from quarterly to monthly billing system though it would result in increased billing costs of $22,600 would on balance be beneficial because it would enable utility to more quickly detect and repair malfunctioning meters and leaks in water lines, minimizing lost revenues and assuring customers of more accurate billing while reducing utility's working capital requirements); Co-Tran, Fla. Transit Management, Inc. v. Goodman, 415 So.2d 155 (Fla. 4th DCA 1982) (whether bus driver's discharge from employment was for misconduct connected with the employment); Alterman Transp. Lines, Inc. v. Unemployment Appeals Comm'n, 410 So.2d 568 (Fla. 1st DCA 1982) (whether employee used company facilities and employees for personal business and whether such misconduct was connected with his employment); Forkey & Kirsch, P.A. v. Unemployment Appeals Comm'n, 407 So.2d 319 (Fla. 4th DCA 1981) (whether employee left employment without good cause); Department of Professional Regulation v. Wagner, 405 So.2d 471 (Fla. 1st DCA 1981) (whether various words and actions during chiropractic treatment constituted sexual misconduct); Lord Chumleys of Stuart, Inc. v. Department of Revenue, 401 So.2d 817 (Fla. 4th DCA 1981) (whether activities constituted being in the business of renting, leasing or letting of real estate and whether mortgage payments, property taxes and insurance payments constituted rent payments); School Bd. of Leon County v. Hargis, 400 So.2d 103 (Fla. 1st DCA 1981) (whether actions constituted unlawful discrimination because of race or color); Cenac v. Florida State Bd. of Accountancy, 399 So.2d 1013 (Fla. 1st DCA 1981) (whether accountant was holding self out as being a C.P.A.); Jenkins v. State Bd. of Educ., 399 So.2d 103 (Fla. 1st DCA 1981) (whether school teacher's conduct was improper); David Clark & Assocs., Inc. v. Kennedy, 390 So.2d 149 (Fla. 1st DCA 1980) (whether harassment of employee was sufficient that a prudent person would have quit job); Sapp v. Florida State Bd. of Nursing, 384 So.2d 254 (Fla. 2d DCA 1980) (whether nurse left medication room or a medication cart unattended and whether prohibitive instructions existed relevant thereto); Tampa Wholesale Liquors, Inc. v. Division of Alcoholic Beverages & Tobacco, Dep't of Business Regulation, 376 So.2d 1195 (Fla. 2d DCA 1979) (whether alcoholic beverages were sold to other than a licensee and whether conspiracy involved), cert. denied mem., 388 So.2d 1112 (Fla. 1980); Koltay v. Division of Gen'l Regulation, Dep't of Business Regulation, 374 So.2d 1386 (Fla. 2d DCA 1979) (whether evidence of misconduct supported revocation of electronic dealer's license); Oliff v. Florida State Bd. of Nursing, 374 So.2d 1054, 1055 (Fla. 1st DCA 1979) (whether application fee had to be received or simply mailed before deadline); Borovina v. Florida Constr. Indus. Licensing Bd., 369 So.2d 1038 (Fla. 4th DCA 1979) (whether licensed contractor aided and abetted another uncertified person in unauthorized construction activities); Catholic Social Servs. v. State Dep't of Commerce Bd. of Review, 365 So.2d 427 (Fla. 1st DCA 1978) (whether employee discharged because of misconduct); Samson v. Bureau of Community Medical Facilities Planning of Dep't of Health & Rehabilitative Servs., 363 So.2d 412 (Fla. 1st DCA 1978) (whether bureau failed to reject application for hospital within time limit set for such rejection); Boyette v. State Professional Practices Council, 346 So.2d 598 (Fla. 1st DCA 1977) (whether school teacher's effectiveness was seriously reduced as a result of publicity over alleged sexual misconduct). But see, e.g., Utilities, Inc. of Fla. v. Florida Pub. Serv. Comm'n, 420 So.2d 331 (Fla. 1st DCA 1982) (fair and proper rate of return on equity capital for regulated utility); City of Clearwater v. Lewis, 404 So.2d 1156 (Fla. 2d DCA 1981) (whether employee waived right to union representation at termination of his employment  PERC established a higher standard for proof of waiver); Holden v. Department of Corrections, 400 So.2d 142, 143 (Fla. 1st DCA 1981) (whether prison inmate should be permitted to marry); Fraser v. Lewis, 360 So.2d 1116 (Fla. 1st DCA 1978) (whether proposed bank showed reasonable promise of success).
[4] In response to the dissent, we note only that the strike here can best be characterized as a wildcat strike. To hold the PBA liable for such activity would require a finding that the PBA in some manner sanctioned the activity. This record simply does not support such a finding, and the hearing officer, the finder of fact, made no such finding.
[5] By separate order, a majority of the panel has certified this case to the supreme court as one which passes upon a question of great public importance.
[1] It may, however, be a mitigating factor.