**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ARKANSAS–LOUISIANA GAS COMPANY, Respondent.**

No. 17535.

United States Court of Appeals
Eighth Circuit.

June 30, 1964.

Anthony J. Obadal, Attorney, N. L. R. B., Washington, D. C., Arnold Ordman, General Counsel, N. L. R. B., Washington, D. C., Dominick L. Manoli, Associate General Counsel, N. L. R. B., Washington, D. C., Marcel Mallet-Prevost, Asst. General Counsel, N. L. R. B., Washington, D. C., and Allison W. Brown, Jr., Attorney, N. L. R. B., Washington, D. C., for petitioner.

Tom Gentry, of Gentry & Dabbs, Little Rock, Ark., Ray Thornton, Jr., Little Rock, Ark., for respondent.

Before VOGEL, MATTHES and RIDGE, Circuit Judges.

VOGEL, Circuit Judge.

The National Labor Relations Board has petitioned this court pursuant to § 10(e) of the National Labor Relations Act, as amended, 61 Stat. 136, 73 Stat. 519, 29 U.S.C.A. § 151 et seq., for enforcement of its order of June 13, 1963, against Arkansas-Louisiana Gas Company, respondent. The Board's decision and order are reported at 142 N.L.R.B. No. 117. The Board, adopting its Trial Examiner's findings and recommended order, found that respondent had violated §§ 8(a) (3) and (1) of the Act by discharging eleven employees for engaging in union activities. It also found that respondent had violated § 8(a) (1) of the Act by interrogating and threatening its employees with respect to union activity. The Board's order, of which enforcement is requested, requires respondent to cease and desist from the unfair practices found and from in any other manner interfering with the rights of its employees under the Act. Affirmatively, the order requires reinstatement of the employees named in the complaint, the restoration of seniority and all other rights and privileges to those already re-employed, the reimbursement of back pay plus interest at the rate of 6% per annum, and the posting of appropriate notices.

Respondent objects to the petition for an enforcement order on the grounds that there is no substantial evidence in the record justifying it and further asks that it be denied because of claimed prejudicial errors committed by the Trial Examiner and approved by the Board whereby respondent was denied due process of law.

The record indicates that respondent is a Delaware corporation conducting an interstate utility business in Louisiana, Arkansas, Texas, Oklahoma, Kansas and other locations where it is engaged in the sale and distribution of natural gas. It also owns and operates non-utility enterprises through wholly owned subsidiaries. During the year preceding the issuance of the complaint herein respondent received gross revenue of more than $100,000,000. No jurisdictional issues are present.

As part of its business operations respondent maintains a trucking terminal on 15th Street in Little Rock, Arkansas. In May 1962 there were 17 truck drivers employed at such terminal. As early as March of 1962 the drivers at the 15th Street terminal learned of management's plan to change the method by which wages were computed. After several attempts to meet and persuade management not to effect this change, the employees sought to form a union. Between April 20th and May 8th ten of the 17 drivers signed application cards with Local 878 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. Between May 11 and May 14, 1962, respondent discharged all but four of its truck drivers working at the 15th Street terminal, doing so suddenly and without warning. None of the four retained drivers had signed a union card. Circumstances surrounding the various discharges are fairly summarized from the record as follows:

On May 11th, Jenkins, the dispatcher who ran the trucking terminal and who was held by the Board to be a company supervisor, came into the yard at the trucking terminal and stopped Creed, who was about to take a truck to St. Louis. Jenkins said, "They have just fired the whole bunch. * * * They have just fired every truck driver down here." Jenkins and Creed spoke to Garage Foreman Lafferty, who told them that he had received instructions by telephone from Lindsey Hatchett, respondent's vice president, to lay off each driver as he arrived at the terminal. Upon Jenkins' protest that he had several runs scheduled at that time, Lafferty stated that Hatchett had told him to keep drivers Ford, Younts, Ware and Roberts. None of these four had signed union cards. Lafferty explained that he was instructed by Hatchett that this was an "economic layoff, and we were just going to have to tighten our belts." Jenkins told Creed and another driver, Lowery, that he had so many trips scheduled he did not know what he was going to do for men to drive the trucks.

Later that afternoon in Jenkins' office driver McEuen, who was among those discharged, remarked to Creed, who was the leader in union activity, that, " * * * it looks like I cut my own throat. I did not want to sign one of these cards because I thought I was going to the office, * * * and I would not be allowed to vote when the Union voted. * * * Now, I have messed around and I have no protection at all. I did not sign a card and you boys did, and you have protection, and I haven't." Jenkins broke in and asked, "You did not sign a card?" McEuen turned to Creed for confirmation of this fact, and Creed agreed that McEuen had not signed a card. The next day McEuen was rehired by respondent.

That evening Jenkins informed driver Ballard that the latter was among those discharged. Jenkins asked Ballard whether he had joined the union. Ballard replied that he was not a member and Jenkins said, "Well, Creed and some of the guys seem to think that is the reason for the lay off, and if it was, I think I can get you back on." Ballard was rehired by the respondent on September 3, 1962, but with loss of vacation pay and with no seniority.

On May 14th Ballard and three other drivers went to Jenkins' office. Jenkins told then that a new driver, Jones, had been hired that morning and that the company was transferring in extra drivers from its home office at Shreveport.

With reference to interference, restraint and coercion, it is established in the record that W. R. Stephens is president of the respondent corporation, and that Albert Stephens, a stockholder and brother of respondent's president, had been instrumental in the original hiring of a number of respondent's drivers. Drivers Harper and Lowery had obtained employment applications from Albert Stephens and after filling them out returned them to him. During the course of an interview with Lowery, Albert Stephens questioned Lowery about his feelings toward the union. Lowery replied that unions were all right in their place, that he had worked on jobs that were union and ones that were not. At the end of the interview, Stephens told him that respondent would hire him. Three weeks later respondent notified Lowery to report to work. Albert Stephens also offered to hire driver Kauffman for a job with respondent. Kauffman filled out and returned the application blank given to him by Albert Stephens and thereafter was interviewed at the latter's home. Stephens told him that he had put his "o. k." on the application and that Kauffman would hear from respondent in a few days. Albert Stephens said "When I put my O. K. on things, they generally stay fixed." He also asked Kauffman, "You know what to do about the union?" Kauffman said, "Yes, I do." About three weeks thereafter Kauffman began working for the company.

Driver Newsom filled out an application for employment which he took to Albert Stephens, who put his "o. k." on it. Subsequently, at Albert Stephens' request, Newsom interviewed him at the Stephens home. Albert Stephens told him that he had his application and asked if he wanted to go to work for the gas company. Albert Stephens then said, "You know how the Gas Company operates. It is against the Union." Stephens asked him if he was for the union and was told that Newsom wasn't. Later Albert Stephens called him and told him to report to the 15th Street office.

Driver Harrington, who was a second cousin of the Stephens brothers, filed his application directly with respondent. About two months later Albert Stephens called him out to his home and told him, "* * * that he had a job for me if Jack York did not take the job." Albert Stephens also asked how Harrington felt about the union and Harrington replied that he did not like the union. The next day Albert Stephens told him to report to Vice President Hatchett. Harrington did so and began working the following day. Without more, this is an indication of the activities of Albert Stephens insofar as *employment* of the truck drivers and inquiries as to their union sympathies is concerned.

A few days after the May 11th discharges, Albert Stephens went to driver Kauffman's home, where he questioned him concerning the dismissals and the union activity of the drivers. Later four of the discharged drivers went to Albert Stephens' home at his request. Albert Stephens told them he wanted "straight" answers to his questions and demanded that they tell him "who started this Union activity". Albert Stephens said he was not a representative of the company but that if they gave him the information he wanted, he would guarantee their jobs back. Creed questioned Stephens about the validity of any guarantee he could give if he did not represent the company and Stephens replied, "How did you get your jobs to start with?" He then told the men to talk it over among themselves and then come back and give him some "straight answers".

It is the Board's contention that (1) substantial evidence, considering the record as a whole, supports its finding that respondent violated §§ 8(a) (3) and 8(a) (1) of the Act by discriminatorily discharging employees to discourage membership and activity in the union; (2)

substantial evidence supports its findings that Albert Stephens was an agent of the respondent and that through him respondent violated § 8(a) (1) of the Act by interrogating and coercing employees concerning their union activity; and (3) its order directing back pay with interest is valid and proper.

■ Respondent contends, first, that the Board failed to establish that it, respondent, had any knowledge of any union activity by the employees before the layoff. However, an examination of the record as a whole discloses substantial evidence of knowledge. In March preceding the May 1962 discharges the drivers indicated their dissatisfaction with the company's proposed change of its wage structure, arranged meetings with Transportation Superintendent Crawford, with Virgil Creed acting as their spokesman. Superintendent Crawford was subsequently relieved of his duties and replaced by Lindsey Hatchett, a vice president. A meeting was requested with Hatchett, who said he would "look into it". Subsequently, about April 15th, Lowery and some of the other drivers were talking with Jenkins. Lowery testified:

"Q. Tell us what was said?

"A. We were talking about our conditions and it seemed like something had to be done, and we could not talk to anybody. I said that it seemed like the Union was our answer, and some were inclined to agree, and Mr. Jenkins said 'yes, it looked like something had to be done.'

"Q. Mr. Lowery, how did you apply for your job with the Gas Company?

"A. Through Mr. Albert Stephens.

"Q. When was this, approximately?

"A. Along about the middle of August, 1961."

Albert Stephens stated he had heard about "the union" on the streets in Sheridan. (Sheridan is the county seat of Grant County wherein both Albert Stephens and his brother W. R. Stephens, president of the company, reside.) We believe it would take a considerable amount of naivete to conclude from this record that the respondent had no knowledge of the union activity of its drivers before their discharge in May 1962. We find the Board's conclusion thereon to be amply supported.

■ It is next contended by the respondent that the Board failed to establish that W. R. Stephens, Albert Stephens, his brother, or Royce Jenkins did, as agents and supervisors of the respondent, interrogate the employees concerning their union membership activities or desires. By 29 U.S.C.A. § 160(e) Congress provided that in a petition to this court for an enforcement order

"* * * The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive."

In assessing the findings, we are guided by the admonition of the Supreme Court in Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456:

"* * * The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. This is clearly the significance of the requirement in both statutes that courts consider the whole record. * * *

"* * * Nor does it mean that even as to matters not requiring expertise the court may displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*. Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light

that the record in its entirety furnishes, including the body of evidence opposed to the Board's view."

As to dispatcher Jenkins, the Board stated in its Decision and Order:

"* * * In addition to the evidence as to supervisory duties marshalled by the Examiner in support of his finding, the undisputed testimony of the General Counsel's witnesses shows that Jenkins in assigning drivers to their runs used his independent judgment to equalize their earnings. He also served as a link between management and the drivers, arranging meetings for them with the Company officials. In the administrative hierarchy at the time of the layoff, 17 employee drivers reported directly to him, and he himself reported to a vice president in charge of the entire transportation department of the Company. And it was Jenkins, again on his own initiative, who was at least instrumental in securing the reinstatement of McEuen. Under these circumstances, with no evidence adduced to the contrary by the Respondent, we hold, as did the Trial Examiner, that Jenkins was a supervisor within the meaning of Section 2(11) of the Act."

With reference to Albert Stephens, the Board, after referring to the testimony as summarized supra, stated:

"* * * These incidents, together with those cited by the Trial Examiner, convince us that Albert Stephens was an agent of the Respondent and that, because of his interrogation of the employees regarding their union sympathies and the leadership of the organizational movement, the Respondent violated Section 8(a) (1) of the Act."

In determining responsibility for union activities, the principles of agency and its establishment are to be construed liberally. The Supreme Court made reference thereto in International Ass'n of Machinists, etc. v. Labor Board,

1940, 311 U.S. 72, 80, 61 S.Ct. 83, 85 L.Ed. 50, wherein, speaking through Mr. Justice Douglas, it said:

"The employer, however, may be held to have assisted the formation of a union even though the acts of the so-called agents were not expressly authorized or might not be attributable to him on strict application of the rules of *respondeat superior*. We are dealing here not with private rights (Amalgamated Utility Workers v. Consolidated Edison Co., 309 U.S. 261 [60 S.Ct. 561, 84 L.Ed. 738]) nor with technical concepts pertinent to an employer's legal responsibility to third persons for acts of his servants, but with a clear legislative policy to free the collective bargaining process from all taint of an employer's compulsion, domination, or influence. The existence of that interference must be determined by careful scrutiny of all the factors, often subtle, which restrain the employees' choice and for which the employer may fairly be said to be responsible."

See, also, H. J. Heinz Co. v. Labor Board, 1941, 311 U.S. 514, 520, 521, 61 S.Ct. 320, 85 L.Ed. 309, and N. L. R. B. v. Link-Belt Co., 1941, 311 U.S. 584, 599, 61 S.Ct. 358, 85 L.Ed. 368. It is the respondent's contention that the Supreme Court's holdings in the cases supra are no longer authority, having been announced prior to the amendment of the present Act. Nevertheless, the present Act, 29 U.S.C.A. § 152(13) provides:

"In determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling." (61 Stat. 139)

Subsequent holdings of this and other courts indicate clearly that the doctrine announced by the Supreme Court in International Ass'n of Machinists, etc. v. Labor Board, supra, continues to be followed. N. L. R. B. v. Champa Linen

Service Co., 10 Cir., 1963, 324 F.2d 28, 30; N. L. R. B. v. Des Moines Foods, Inc., 8 Cir., 1961, 296 F.2d 285, 287; N. L. R. B. v. Birmingham Publishing Co., 5 Cir., 1959, 262 F.2d 2, 8; N. L. R. B. v. Solo Cup Co., 8 Cir., 1956, 237 F.2d 521, 523–524; N. L. R. B. v. Mississippi Products, Inc., 5 Cir., 1954, 213 F.2d 670, 672–673; N. L. R. B. v. Geigy Co., 9 Cir., 1954, 211 F.2d 553, 557; N. L. R. B. v. Howell Chevrolet Co., 9 Cir., 1953, 204 F.2d 79, 84, aff'd on other grounds 346 U.S. 482, 74 S.Ct. 214, 98 L.Ed. 215 (1953). In discussing this same question, the court in Local 636, etc., Plumbing & Pipe Fit. Ind. of United States v. N. L. R. B., 1961, 109 U.S.App. D.C. 315, 287 F.2d 354, 359, said:

"We know of nothing in the Act of 1947 or in the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C.A. § 401 et seq., which affects the vitality of * * * [the doctrine embodied in I. A. of M.]."

In interpreting 29 U.S.C.A. § 152(13), quoted supra, the courts have held that strict principles of agency are not required to be applied in determining an employer's responsibility for the union activities of its supervisory employees. See, e. g., Local 636, etc., Plumbing & Pipe Fit. Ind. of United States v. N. L. R. B., supra, and cases cited therein.

■ We think the record justified the Board's conclusion that respondent knew of, approved and ratified the actions of Albert Stephens in connection with the employment, in the first instance, of a number of respondent's drivers and in, subsequent to the discharge, interrogating them with reference to union activity. Albert Stephens, the brother of respondent's president, distributed respondent's blank employment application forms, received back the forms after they were filled out by applicants for employment, interviewed prospective employees, reported the results of those interviews to respondent, informed applicants whether they could work for respondent and informed them when, where and to whom to report for work. Appli-

cants approved by Albert Stephens who reported at the appointed time and place were given work by the respondent. In one instance an applicant who had applied for a position directly with the company was subsequently called by Albert Stephens and told to see him for an interview. Upon receiving Albert Stephens' approval, this applicant was given work by respondent.

■ We conclude from the foregoing and without further reference to detailed evidence in the record that the Board's findings that Jenkins was a supervisor and Albert Stephens was an agent of the respondent for whose activities respondent became responsible are supported by substantial evidence in the record considered as a whole and may not be set aside here.

■ We further hold that there is substantial evidence in the record from which the Board was fully justified in finding that the drivers herein were discharged because of their union activity and that such discharges were in violation of § 8(a) (3) of the Act. The timing and manner of discharges were compellingly significant. Following unsatisfactory and inconclusive meetings with respondent's executives over wage computation methods, the drivers began union organizational activities. Between April 20 and May 8, 1962, ten drivers of the 17 employed at this terminal signed union application cards. Between May 11 and May 14, 1962, all drivers who had thus signed cards were, without previous warning, laid off and terminated. Only four drivers of the 17 were retained. None of the four had signed a union card. Another driver, upon telling Jenkins that he had not signed a union card, was promptly rehired. These discharges were made in the face of apparent driver shortage, were accompanied by efforts to get replacements from the respondent's plants elsewhere and were made without regard to seniority ratings or consideration of accident records and efficiency classifications based thereon. The common factor among the discharged drivers

was the signing or carrying of a union application card.

It may also be noted that the employees were told in the first instance that this was an "economic layoff and we were just going to have to tighten our belts". Respondent's utter failure to introduce any evidence to justify such a conclusion plus the fact that the discharges left them shorthanded is a complete and sufficient refutation of respondent's contention that the discharges were for economic reasons and because of lack of work.

We find the Board's conclusions are fully justified by the record considered as a whole, including that which "fairly detracts from its weight".

■■ Respondent contends that certain prejudicial errors were committed by the Trial Examiner and adopted by the Board. Among other things, it claims that it was not permitted by the Examiner to show when it hired driver William Jones that it intended for him to work as a pipeline spacer on construction work, a job which, at the time of Jones' hire, was not yet in existence. The ruling of which respondent complains is not before us in the printed record. Respondent has accordingly failed to comply with our Rule 10(b) which provides, *inter alia*, "If the appellant or petitioner in his brief challenges rulings upon evidence, such evidence, the objections interposed thereto, and the rulings questioned shall be quoted in the printed record, * * *." Failure to comply with Rule 10(b) would justify this court in refusing to consider respondent's contention. Zitserman v. F. T. C., 8 Cir., 1952, 200 F.2d 519, 521. The Board has, however, seen fit to attempt to refute respondent's contention in its brief. It points out, and we agree, that the evidence fully supports the conclusion that respondent hired Jones to work as a truck driver. Supervisor Jenkins advised the discharged drivers that Jones had been hired for that purpose and it is undisputed that before coming to work for respondent Jones took a physical examination to qualify him as a truck driver pursuant to the requirements of the Interstate Commerce Com-

mission. Supervisor Jenkins told the discharged drivers he had gotten some help from Shreveport and that as to Jones, "Yes, we hired him this morning, [shortly after the discharges] and he is going to take his physical now. If he passes, he will go out on a trip this evening." If any error was committed in connection with refusing respondent's attempt to make a further showing, if it did so attempt, then we find the error to be without prejudice.

■ We likewise hold that the Trial Examiner's exclusion of respondent's proffered evidence that it had amicable relations with other unions to be without prejudice. Cf. Pittsburgh Plate Glass Co. v. N. L. R. B., 1941, 313 U.S. 146, 158, 61 S.Ct. 908, 85 L.Ed. 1251; National Airlines, Inc. v. C. A. B., 1963, 116 U.S.App.D.C. 114, 321 F.2d 380, 383.

■ Respondent's further claim is that it was improperly denied the right to inspect pre-trial statements of the general counsel's witnesses. A number of witnesses had been called by the general counsel, examined, cross-examined and excused. The witness Marvin Younts (one of the retained drivers who had not signed a union card) was then called. During the direct examination of Younts it appeared that he had given a written statement during the investigation but on the witness stand claimed that he had been drinking during that time and could not remember what had been said. Counsel for the respondent then stated:

"Now, Mr. Examiner, at this time, I would like to ask that Counsel for the General Counsel furnish us with a copy of that statement and all other statements which he has taken from his witnesses, which he has used or may use hereafter."

Further examination of the witness Younts failed to identify the statement, whereupon the general counsel asked that the witness be declared hostile. The request was not granted but the Trial Examiner suggested that the witness be withdrawn. This was done and all of his

**798**

testimony was stricken. Counsel for respondent renewed his request for a copy of the statements "that Counsel has used in examining other witnesses he has put on the stand." The Examiner ruled:

"I just have this to say, that you are untimely in your request for statements of previous witnesses. The witnesses have been excused, and the request is untimely."

The Board's rules promulgated after Jencks v. United States, 1957, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, provide in pertinent part as follows: 29 U.S.C.A.App.

"§ *102.118 Same; Board employees prohibited from producing files, records, etc., pursuant to subpena ad testificandum or subpena duces tecum, prohibited from testifying in regard thereto*

\* \* \* \* \* \*

" \* \* \* *Provided,* After a witness called by the general counsel has testified in a hearing upon a complaint under section 10(c) of the act, the respondent may move for the production of any statement of such witness in possession of the general counsel, if such statement has been reduced to writing and signed or otherwise approved or adopted by the witness. Such motion shall be granted by the trial examiner. If the general counsel declines to furnish the statement, the testimony of the witness shall be stricken: \* \* \*."

Under the foregoing rule, it is perfectly clear that the statement of the witness Younts need not have been produced after his testimony had been stricken. We further conclude that the Trial Examiner's ruling that the request as to the other statements of witnesses who had been excused was untimely is likewise correct.

■ As to the respondent's contention that the Board is without authority to award interest on back pay, this court has previously approved the Board's practice of adding 6% interest to back pay awards. See Marshfield Steel Co. v. N. L. R. B., 8 Cir., 1963, 324 F.2d 333, 337–339; N. L. R. B. v. Byrds Mfg. Co., 8 Cir., 1963, 324 F.2d 329, 333.

We have examined all of the respondent's claimed errors and find none of them to be of substantial merit.

An order of enforcement will be granted.