**BE & K CONSTRUCTION COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 93–2637.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 10, 1994.

Decided May 12, 1994.

Counsel who presented argument on behalf of the appellant was Dion Y. Kohler of Atlanta, GA.

Counsel who presented argument on behalf of the appellee was Frederick C. Havard of Washington, DC.

Before BEAM and MORRIS S. ARNOLD, Circuit Judges, and WELLFORD *, Senior Circuit Judge.

WELLFORD, Senior Circuit Judge.

We review the action of the National Labor Relations Board ("NLRB") in this case following a very serious disturbance, described by the Administrative Law Judge ("ALJ") as a full-scale "riot," involving cer-

tain union members at a massive construction project of the petitioner, BE & K Construction Company ("BE & K"), at International Falls, near the conjuncture of the borders of Minnesota, Michigan and Canada. Several unions were involved in the mass picketing and demonstrations at the BE & K construction site which preceded the September 9, 1989 riot. The ALJ described a series of walkouts and "disruptive picketing activity at the jobsite," as well as "menacing" and "intimidating" conduct of construction trade unions which occurred over a number of weeks prior to the riot which resulted in property damage of over $2,000,000 and serious personal injury to a number of persons trying to protect the property destroyed.

Following this episode, BE & K filed an unfair labor practice charge against Ironworkers Local Union 783 ("the local") in Marquette, Michigan, for threatening, coercing and restraining its employees by (1) trespassing and disrupting operations; (2) physical assault and battery; (3) destruction of property; and (4) arson. The General Counsel for NLRB (Eighteenth Region) filed a complaint thereafter against the local (or "respondent") for engaging in unfair labor practices by restraining and coercing "employees in the exercise of their rights guaranteed" under the NLRA and by "participating in a riot at BE & K's camp housing compound ... by burning it to the ground, and by otherwise threatening employees and destroying property." An ALJ heard the charges and rendered a decision on April 29, 1992 in case No. 18–CB–2021. After an analysis of the facts, the contentions of the parties, the briefs, and "factual highlights of the case," the ALJ exonerated the local of responsibility for the undisputed violent and malevolent conduct displayed in the happenings at BE & K's property, including numerous criminal offenses against BE & K, its employees, the police, and others. Petitioner excepted to the conclusion that the local "did not engage in unfair labor practices as alleged." Essentially, BE & K maintained before the Board that: the local was responsi-

* The Honorable Harry W. Wellford, Senior Circuit Judge, United States Court of Appeals for the Sixth Circuit, sitting by designation.

ble for its members' participation and that it was actively involved in the riot; the local condoned and ratified its members' illegal actions; the ALJ committed clear evidentiary errors or oversights; the ALJ erroneously refused to consider "principles of mass action;" and the ALJ failed to attach significant weight to the actions of the local's principal official, John LaVallee.

The Board affirmed the ALJ's decision despite its professed abhorrence of "the rioting, violence, physical attacks and property damage that occurred." The Board, in its one page decision and order (Case No. 18–CB–2021) (311 NLRB # 73), footnoted the following findings of the ALJ:

[M]ost of the passengers on the chartered bus from Iron Mountain, Michigan, to International Falls, Minnesota, on September 8–9, 1989, were members of the Respondent, and (2) that the passengers on the bus were drawn primarily from the Respondent's membership. But the record does not actually reveal the names or organizational affiliations of the passengers who were on the bus to International Falls. The record does, however, reveal the names and union affiliations of the passengers who were on the bus as it began its *return trip from* International Falls later in the day on September 9. There were 32 passengers on the bus then, 11 of whom were members of the Respondent.

. . . . .

[T]he judge stated that bus owner Donald Dabb testified that Respondent Business Manager John LaVallee telephoned him in late summer 1989 to ask about chartering a bus for a trip to "Minnesota." Dabb's testimony at the hearing, however, which was consistent in this regard with his testimony in an earlier deposition that is in evidence, was that LaVallee asked about a trip to "Minneapolis."

. . . . .

[T]he judge stated that Ralph Guentzel was a member of the Respondent. The record establishes that Guentzel was a member of Iron Workers Local 563, but not that he was also a member of the Respondent. From the context of his fn. 3, it appears that the judge meant to refer to Robert Genschow, a member of the Respondent who was convicted of riot, but who was not on the bus when it began its return trip from International Falls on September 9, 1989.

311 NLRB # 73.

The Board also noted that its "established policy is not to overrule an [ALJ's] credibility resolutions unless the clear preponderance of all the relevant evidence convinces us that they are incorrect." The Board discovered "no basis for reversing his findings." The Board also responded negatively to BE & K's exception about LaVallee's personal arrangement for legal representation and posting bail for local members who were arrested at the scene "in conjunction with the riot:"

Four members of the Respondent [local] did ultimately plead guilty early in 1990 to criminal charges of riot. But at the time LaVallee posted bail for them and for others who also were arrested, no judicial determination had yet been made that any of them had engaged in any unlawful act, and they were thus still presumptively innocent of any wrongdoing. Indeed, three of the seven members of the Respondent who were arrested were subsequently released.

311 NLRB # 73.

The Board concluded, therefore, that the local had no liability based upon LaVallee's "personal activities" noted above, which "was not condonation or ratification" by the local of the "*alleged misconduct* for which the members had been arrested."[1] (emphasis added). LaVallee's conduct, the Board asserted, was simply assisting members "to exercise a legal and constitutional right." 311 NLRB # 73.

We have carefully considered the record in this case and all the briefs, including the local's brief as intervenor. We begin by referring to the statutory words of the charge made against the local: "It shall be an unfair labor practice for a labor organiza-

1. "LaVallee obtained a personal loan which he used for these activities [which was] . . . repaid 2 months later through contributions" of local members and others. 31 NLRB # 73 n. 3.

tion or its agents to restrain or coerce employees in the exercise of the rights guaranteed in section 7 [29 U.S.C. § 157]" of this article. 29 U.S.C. § 158(b)(1)(A).

 Included among the rights of employees protected under 29 U.S.C. § 157 are "the right ... to form, join or assist labor organizations ... [and] the right to refrain from any or all of such activities...." The right to refrain from joining or assisting a union is an equally protected right with that of joining or forming a union. *Local 57, Int'l Ladies' Garment Workers' v. NLRB*, 374 F.2d 295 (D.C.Cir.), *cert. denied*, 387 U.S. 942, 87 S.Ct. 2074, 18 L.Ed.2d 1328 (1967); *Dannen Grain and Milling Co. v. NLRB*, 130 F.2d 321, 328 (8th Cir.1942); *Blanchard v. Johnson*, 388 F.Supp. 208, 215 (N.D.Ohio 1974), *rev'd on other grounds*, 532 F.2d 1074 (6th Cir.), *cert. denied*, 429 U.S. 834, 97 S.Ct. 100, 50 L.Ed.2d 100 (1976); *NLRB v. Granite State Joint Board, Textile Workers Union of America, Local 1029*, 409 U.S. 213, 216, 93 S.Ct. 385, 387, 34 L.Ed.2d 422 (1972) (§ 7 gives an employee the right to refuse to undertake and involve himself in union activities). The Supreme Court quoted a co-sponsor's statement of purpose with regard to this section in *NLRB v. Allis–Chalmers Mfg. Co.*, 388 U.S. 175, 187–188, 87 S.Ct. 2001, 2010, 18 L.Ed.2d 1123 (1967), noting it is "designed to protect employees in their freedom to decide whether or not they desire to join labor organizations, to prevent them from being restrained or coerced." The NLRA, thus, proscribes coercive, violent and threatening conduct by either an employer or a labor organization.

The policy of the act, as it addresses wrongful and unfair conduct by a union, is set out in 29 U.S.C. § 151:

> Experience has further demonstrated that certain practices by some labor organizations, their officers, and members have the intent or the necessary effect of burdening or obstructing commerce by preventing the free flow of goods in such commerce through strikes and other forms of industrial unrest or through concerted activities which impair the interest of the public in the free flow of such commerce.

We must decide whether there is substantial evidence in this record to support the Board's factual determinations. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951). *See also WCCO Radio, Inc. v. NLRB*, 844 F.2d 511, 514 (8th Cir.), *cert. denied*, 488 U.S. 824, 109 S.Ct. 72, 102 L.Ed.2d 49 (1988). The Board, however, made few independent factual findings in this case. For the most part, the Board simply adopted the ALJ's "rulings, findings and conclusions." We, therefore, assess the ALJ's decision carefully together with the entire record, mindful that our examination "requires more than a parsing of the record for evidence supporting the Board's decision. We must also consider evidence in the record that fairly detracts from the weight of the decision." *Schnuck Markets, Inc. v. NLRB*, 961 F.2d 700, 704 (8th Cir.1992).

 The underlying activity in this controversy extended over a 400 mile crescent-shaped area extending from Wisconsin through Michigan and into northern Minnesota. According to the ALJ, seemingly uncontradicted evidence showed that "unionized construction trades," including ironworkers unions, expressed over many months prior to September 9, 1989, "animosity" and "virulent hostility" to Boise Cascade's naming BE & K as project construction manager of a $500,000,000 paper mill expansion at International Falls, Minnesota. These unions openly disapproved of BE & K's use of non-union employees and non-union subcontractors (as well as union participants or contractors) in the massive construction work there. In sum, the controversy involved the petitioner and its employees and their exercise of their rights to operate, at least in part, free of union contracts in an area in which the trade union had "an extreme depth of concern" about BE & K's "merit shop" operations and what they viewed as a "threat against union labor" by utilization of non-union employees.

We recite hereinafter from the ALJ's findings of pertinent background information. In July, 1989, BE & K obtained a state court temporary restraining order to limit "disruptive picketing activity" and other violent and destructive activity of persons "wearing un-

ion insignia from places as far as Michigan." Shortly thereafter, "rumors circulated throughout the community that a large disturbance was about to affect [BE & K's] man-camp" on September 9.

The local had 315 members serving a trade area of Michigan's upper peninsula, just across from International Falls. John LaVallee was the local's business manager and had been since 1973. He was also recording secretary of the North Central States District Council with jurisdiction over an area just adjacent to International Falls. He operated from an office in Marquette. The local furnished 250 persons, a large part of the union, on a paper plant job at Iron Mountain, Michigan, during September, 1989.

Early on September 9, 1989, the International Falls police observed the blocking of nearby roadways and "loud exhortation to ... trespass" at the BE & K site. A crowd of about 150 "moved purposefully and ominously" to the man-camp, and, within an hour, a crowd "of over 200 and eventually to total about 450 rioted."

Specifically, the ALJ made the following findings:

> Among persons participating in this riot were those on a chartered bus that had left Iron Mountain, Michigan the night before. This bus departed at about 7 p.m. on Friday, September 8, and arrived in International Falls at about 3 a.m. after the customary 8 hours driving time. Most of the bus passengers were members of Respondent, and as requested the driver let them out at a union hall. The cost of the round trip charter was to be $1,150, and this amount was paid in cash by the unseen act of money being left on the dashboard just before departure. The bus had been scheduled for a midday return trip on September 9, but it was stopped in transit out of International Falls by police. All occupants were formally disembarked as part of investigatory and pre-prosecutive work relative to the riot. It eventuated that 14 persons from the bus were arrested, and from this number Respondent's members

William Ahlich, Leslie Bedell and Richard Pascoe, along with former member Daniel (Dan) Miller plus two iron workers then working in travel status out of Respondent's office and three persons in construction trades other than iron worker were convicted after guilty pleas to violating Minnesota law prohibiting riot.

Unlike the Board, we find that clear evidence in the record supports the ALJ's findings (except for the LaVallee–Dabb conversation about a trip to the Twin Cities). Significantly, the bus departed early in the evening from Iron Mountain, where a majority of local union members were working on a large project. The distance from Iron Mountain, Michigan, to the site of the riot required eight hours of driving before arrival early in the morning in the vanguard of the group that descended upon, trespassed over the man-camp, and then destroyed it. Half of the persons on the bus who started to return to Michigan after the riot were detained by International Falls authorities for investigation. Three local members on the bus later pleaded guilty to non-related criminal offenses.[2]

BE & K indisputably was a longstanding target of national construction trade unions and a subject of previous violence confrontations by national unions. BE & K was described by them as deserving "attack" and advertisements sought to "motivate building tradesmen in the fight against BE & K." (Reference was made to "the International Paper mills where BE & K is scabbing work.") (Boise Cascade at International Falls was listed at the "top of companies" using BE & K.) Trade union publications urged "solidarity" against BE & K, also described as a "rat" contractor.

Exhibit 43 reflects the names and addresses of the 32 persons exiting the bus on September 9, 1989. Twelve were members or former members of the local. Fifteen others, most of whom were ironworkers who were paying a service fee to the local in connection with work in the Iron Mountain vicinity, were also on the bus. Two were

---

2. A fourth local member, not on this bus, was arrested and also later pleaded guilty to similar offenses.

union ironworkers from Michigan and others were ironworkers with unknown addresses. The local "administered a referral program [for] 'travelers' from other Iron Worker locals engaged in Michigan upper peninsula jobs." The 1990 census population of both Iron Mountain and International Falls was about 8,500 each. Aurora, Wisconsin, had a 1990 population of about 1,000. It seems clear from the record that a clear majority of those on the bus were local members, a former member, and "affiliates" working out of the local office. Several were arrested in connection with the September 9 rampage. There can be little doubt that local members and many closely identified with them, having similar interests, were substantially involved in a riot 400 miles away from Iron Mountain and outside the regular union jurisdiction.

The ALJ found that the local used a bus and bus operator from the small town of Aurora, Wisconsin. Another construction trades union from Iron Mountain hired this same bus operator earlier. This prior union-sponsored trip also sparked "violent disruption at BE & K's personnel office" in International Falls "principally from action by this [other] bus load" of trade union activists. The ALJ found that during this key period there was escalation of "extent and frequency of cross-communication between key union functionaries, Peterson [president of Minnesota State Building Construction Trades Council], Salo [business manager of Local 563, Iron Workers located in Duluth, Minnesota, and also an officeholder in the Iron Range Building & Construction Trades Council] and LaVallee."

The ALJ also found that LaVallee composed a July 24, 1989 letter on the local's stationery and addressed to local members, which advised that BE & K would perform "Iron Work and other Trader work on the [Boise Cascade] project on a non-union basis." He further advised members that "the Union tradesman [sic] on the project have chosen not to work side-by-side with these non-union workers . . . and [are] demonstrat-

ing against BE & K." Finally, he advised that Local 563 in Minnesota needed financial assistance in "demonstrating their right not to work side-by-side with non-union workers." He closed by asking for weekly voluntary contributions "to assist their efforts." LaVallee did not mail the letter as planned because the International Falls project walk-out had not been sanctioned officially, but, as found by the ALJ, "it soon became known that a copy was circulating among iron workers," and "its contents were even printed in a Minnesota newspaper."

Donald Dabb, the bus operator for the fateful September 8–9 trip, was a man of limited memory. He was a long-time resident of a small Wisconsin town only a few miles from Iron Mountain. He had shortly before been engaged by another Iron Mountain union to make the long roundtrip to International Falls. He said the caller making this reservation identified himself only as one among "concerned persons." Dabb quoted an $1150 price payable in advance. He testified that cash in that amount was left on the dash of the bus and he could identify only one former local member, Miller, on the trip. He could not say whether the return passengers were the same as those who departed the night before. He returned again to International Falls on September 11. He was phoned by the same "concerned persons" to pick up "people . . . that are getting out of jail." He proceeded there on September 11 and did not return until September 13.

The ALJ felt the evidence was "in equilibrium" as to whether LaVallee was part and parcel of promoting the organized gathering at International Falls or whether some other "concerned" person used the local's phone anonymously and "surreptitiously" to arrange the trip for the conspiratorial purpose without the support and participation of the local itself. The ALJ conceded, and properly so, "extensive knowledge throughout the Iron Mountain community" of the recent violent activity by other construction trade unionists in Iron Mountain.[3] This question of LaVallee's involvement before and during the ar-

---

**3.** Local 728 Pipefitters subsequently entered into a consent agreement acknowledging responsibili-

ty for this episode against BE & K.

rangement for the fateful bus trip, as well as that of the local in light of the background of animosity against BE & K, is a very close one.[4] The Board added little to the lengthy ALJ analysis of twelve telephone calls "that might implicate Respondent local in at least the chartering of Northland coaches." The ALJ found Dabb's testimony to be "without value," discrediting "his failure to recall more than one contact" with Local 783 or LaVallee or passengers on the bus. In sum, the ALJ concluded that he could not say "that applicable content [of questioned communications] *must have* covered impermissible subjects." We express reservations about the ALJ's failure to attribute significance to LaVallee's published urging of his members to help the Minnesota unions in resisting use of any non-union labor on the Boise Cascade project.

We find it unnecessary, despite our reservations about these matters, to decide whether the Board was in error in not finding that the local had restrained and coerced BE & K (and other) employees in the exercise of their guaranteed rights by the local's conduct up to and including the morning of the riot. We conclude, instead, that the Board was in error in its failure to find that the local, through its officers and agents, thereafter ratified, condoned and adopted the unlawful conduct of many of its own members, and affiliated union ironworkers, on September 9, 1989, and that this conduct, together with evidence of its involvement preceding the riot, constituted an unfair labor practice.

On the question of condoning, ratifying and approving, we again turn to the findings of the ALJ and the Board. Only a day and a half after the return of the bus to Iron Mountain during the early morning hours of September 11, the *"concerned* persons" caller in Iron Mountain asked Dabb to return to International Falls "to pick up individuals that had been jailed following their arrests at the bus."[5] ALJ at 8. Dabb testified, surprisingly, that no one paid him for this trip.

After consultation with local president Ken Perry following the riot, "LaVallee undertook major relief efforts" to aid arrested union members and those associated with the local. *Id.* at 9. He travelled to Duluth, Minnesota (the headquarters of Ironworkers Local 563), set up a "base of operations" there, and "spent almost a week in Minnesota," in the process making "one or more trips up to International Falls." *Id.* LaVallee also arranged a $30,000 loan on September 13 from a Marquette Bank. The loan was described by the bank, the senior vice president, and the loan officer as "a temporary arrangement *to accommodate Ironworkers Local*—John LaVallee."[6] (emphasis added). This loan was repaid in three installments during October and November, 1989.

"[The] bank functionaries [were] long familiar with LaVallee as the business holder of his union's several accounts." ALJ at 9. He engaged an attorney in Minnesota who was assisting other union members and paid out "$16,000 in bail amounts from the [bank] wired loan proceeds *and a lesser amount in fines.*" *Id.* (emphasis added). Repayment of this loan was made through the contributions of local members, who "were aware of the obligations [LaVallee] had undertaken to post bail." *Id.*

From bank records, rather than LaVallee's self-serving statements, it is clear that the loan in practical effect was made to accommodate the local. Members of the local paid off the loans and thus provided for those fellow members and their associates who had been involved in criminal conduct in the riot: (1) attorney fees; (2) bail money; and (3) fines, all with respect to their alleged unlawful acts. Local members were unquestionably aware of associated union activities at International Falls and of September plans for large demonstrations in Minnesota directed against BE & K's use of non-union labor at the International Falls project. LaVallee

---

**4.** LaVallee, for instance, also admitted contacting Northland Bus Company or Dabb "maybe the 10th or 11th of September."

**5.** As previously indicated, the ALJ stated that nine persons on the September 8–9 trip were not only arrested, but also convicted or pleaded guilty to riot-related charges. A majority of these

persons was connected with the local in some fashion.

**6.** This information appeared on the loan application itself, and the bank's stated purpose was "to advance funds to assist Ironworker's local."

and "his" local membership were aware that these violent happenings were outside their own local's jurisdiction and yet they openly supported, countenanced and, by their conduct, ratified the lawless actions in which their own local union members were involved hundreds of miles away from their own principal geographic area.

█ The parties have admitted that a union may be liable for the unlawful acts of its members under the general agency principle of ratification. The NLRA provides that the full gamut of agency principles applies when determining whether an unfair labor practice has occurred. "In determining whether any such person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling." 29 U.S.C. § 152(13). Thus, Congress has set out the policy that the usual principles of agency apply in determining liability for unfair labor practices, and that such liability is not restricted merely to express actions. Rather, such liability may be premised on implied or apparent authority. The courts have adhered to this policy and have liberally construed the various principles of agency in determining employer or union liability for an unfair labor practice.

The Supreme Court recognized the need for "unions to exercise a restraining influence on explosive strike situations." *United Mine Workers v. Gibbs,* 383 U.S. 715, 739, 86 S.Ct. 1130, 1145, 16 L.Ed.2d 218 (1965). In *Gibbs,* the Court applied the agency principle of ratification to determine whether the UMW was liable for violence caused by its members. *Id.* at 738, 86 S.Ct. at 1145. The Court noted: "There can be no rigid requirement that a union affirmatively disavow such unlawful acts as previously may have occurred.... What is required is proof, either that the union approved the violence which occurred, or that it participated actively or by knowing tolerance in further acts...."

This Court, too, has recognized the need to apply broadly the principles of agency so as to further the NLRA's policy of encouraging parties in a dispute to a peaceful conciliation

of their differences. "[I]n determining the responsibility in this area for acts of others, 'the principles of agency and its establishment are to be construed liberally.'" *McGraw–Edison Co. v. NLRB,* 419 F.2d 67, 72 (8th Cir.1969) (citing *NLRB v. Arkansas–Louisiana Gas Co.,* 333 F.2d 790, 795 (8th Cir.1964)). *See also Wagner Electric Corp. v. Local 1104, Int'l Union of Electrical, Radio and Machine Workers,* 496 F.2d 954, 956 (8th Cir.1974) ("A union is responsible for the actions of its officers and members according to the ordinary doctrines of agency").

The NLRB utilizes this same approach. In *Service Employees Union, Local 87 (West Bay Maintenance),* 291 NLRB 82, 1988 WL 214072 (1988), the Board applied the common law principles of agency to determine whether the union was responsible for the unlawful picketing of its members under the theory of ratification. In citing to the *Restatement (Second) of Agency,* the Board stated that "ratification is defined as 'the affirmance by a person of a prior act that did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." *Id.* at 2 (citing § 82 of the *Restatement* ). Section 83 of the *Restatement* defines affirmance as either: "(a) a manifestation of an election by one on whose account an unauthorized act has been done to treat the act as authorized, or (b) conduct by him justifiable only if there were such an election." Finally, § 94 of the *Restatement* notes that: "An affirmance of an unauthorized transaction can be inferred from a failure to repudiate it." Comment b to § 82 states: "Ratification is not a form of authorization, but its peculiar characteristic is that ordinarily it has the same effect as authorization." Thus, if this Court determines that the facts of this case are such that the union, through its actions following the destruction of the man-camp, ratified the conduct of its members, we should also find that it is liable for an unfair labor practice.

An analysis of the relevant federal case law discussing the doctrine of ratification under facts similar to the case at bar indicates that the union in this case indeed ratified the unlawful actions of its members. In *NCR v.*

*NLRB*, 466 F.2d 945 (6th Cir.1972), *cert. denied*, 410 U.S. 966, 93 S.Ct. 1442, 35 L.Ed.2d 700 (1973), a case in which the union was found liable for the unlawful picketing of its members, the Court found it significant that "the union made no effort to disavow either the union hall statements of its agents or the picket line incidents." *Id.* at 961. In *Airco Speer Carbon–Graphite v. Local 502, Int'l Union of Electrical, Radio & Machine Workers of America*, 494 F.Supp. 872 (W.D.Pa.1980), a case where the Court determined the union ratified an illegal work stoppage, the Court noted that the union's failure to "disavow or censure the actions of the striking union members" was indicia of ratification. *Id.* at 877. Furthermore, the Court attached great significance to the fact that "[b]ail bonds for eighteen arrested pickets, which were authorized by the Union Executive Board, were signed by either the President or the Treasurer of Local 502." *Id.* In *C & K Coal Co. v. United Mine Workers*, 704 F.2d 690 (3d Cir.1983), a case in which the Court found that the union ratified the unlawful picketing of its members, the Court noted union involvement in the illegal activities because "the President of the District, acting within the scope of his authority and with the approval of the Executive Board, established a legal defense fund for the payment of fines, counsel fees and costs, as an encouragement for illegal activity." *Id.* at 696. The Court went on to note that "[t]he voucher payments were made from District 5's general fund with knowledge that the pickets being paid had engaged in illegal secondary activity. Payments from the legal defense fund were made with the same knowledge." *Id.* In *East Texas Motor Freight*, 262 NLRB 868, 1982 WL 24659 (1982), a case in which the Board found that the union unlawfully restrained the rights of one of its members, it held that the union's failure to reprimand the illegal activities of one of its stewards or prevent him from engaging in any such conduct in the future constituted a ratification. *See also*, to this

same effect, *Quick Air Freight, Inc. v. Teamsters Local Union No. 413*, 62 Ohio App.3d 446, 575 N.E.2d 1204, 1211 (1989) (whether the union's officers took steps to prevent a repetition of violent acts in the future a factor to consider in whether ratification occurred); *Int'l Union, United Automobile, Aircraft and Agricultural Implement Workers of America v. American Metal Products Co.*, 56 Tenn.App. 526, 408 S.W.2d 682, 692 (1964) (fact that union furnished bail bond and attorneys to union members charged with violent conduct indicia of ratification).

In analyzing these principles of agency, along with the examples of ratification in cases where liability was found on similar facts, we conclude that the local has committed an unfair labor practice in condoning and failing to disavow the unlawful acts of its members. In reaching this decision, we are mindful of the deference we must give to the factual findings of the ALJ and the Board. Our standard of review on this question of fact is whether the ALJ and NLRB's decisions are supported by substantial evidence in the record *when considered as a whole*. *WCCO Radio v. NLRB*, 844 F.2d 511, 514 (8th Cir.), *cert. denied*, 488 U.S. 824, 109 S.Ct. 72, 102 L.Ed.2d 49 (1988) (emphasis added).

Perry, the local president, conceded that "everybody's been telling me" about collections from local members "to help out the guys over in Minnesota." [7] According to the longtime local office secretary, no record was made by the local members of the cash contributions used "to help those people in Minnesota." [8] Anderson testified that she was "not supposed to record" these contributions, "because that's outside of our Local business, it's not our regular business." It happened, she estimated, "between ten and a hundred times," [9] but she could not say exactly how often these "sporadic" gifts came into local headquarters. Regardless, Anderson accepted custody of the money for

---

7. Those telling him included ironworkers, pipefitters, boilermakers, laborers, and operators.

8. Anderson, the Secretary, could not identify the specific persons who brought the contributions in nor the precise dates, but she said "it comes in

from job stewards" and sometimes had a note with it: "collection for Minnesota."

9. Anderson also said "ten, twenty, fifty, I can't remember that."

the designated purpose. Whether LaVallee was also aware of any contributions "for Minnesota" before September 9 is unclear, but, in any event, custody of the money was maintained in a locked drawer under LaVallee's control. LaVallee opened an account with the bank which made him the loan after the riot. The ALJ noted Beatrice Anderson's obvious self-interest as a long-time office employee "working under and alongside LaVallee." [10]

LaVallee conceded that the local had no contractual relationship with Boise Cascade, BE & K, nor any of the latter's subcontractors. He also admitted the local had no jurisdiction in Minnesota. LaVallee, nevertheless, felt it "appropriate to assist [other Minnesota] unions" with regard to the Boise Cascade–BE & K project. He conceded that union activity there "wasn't a sanctioned activity." He also conceded, after September 9, that "it became common knowledge that I had borrowed a substantial amount of funds to get some people out of a bind in International Falls," and he received contributions from local members to repay the loan after mid-September. Indeed, LaVallee was himself making preparations with Dabb to rent a bus or busses to transport his local members to Minnesota, but he claimed that this was for another rally or demonstration in the Twin Cities the following Saturday. The contributions, LaVallee admitted, were to repay costs of posting bail and providing an attorney for persons arrested as a consequence of the riot after being told "what the hell happened" there. LaVallee was interested in the BE & K project because "we faced a similar situation . . . [and] we're very familiar with the situation that various local unions . . . faced with Boise Cascade and BE & K." He conceded also having "general [not specific] knowledge" of the local Michigan pipefitters union's involvement at International Falls.

The union paid LaVallee's expenses in Minnesota, including costs of making arrangements for obtaining bail and legal representation for the local's arrested members. LaVallee testified at the hearing: "*I* didn't collect any money." (emphasis added). It seems logical to infer that the local then must have been the entity which collected the money to pay the loan arranged by LaVallee used to defray legal expenses for the members and others in International Falls. Some of the ironworkers who had worked, but walked off the BE & K job in Minnesota, "ended up working with us [the local]," according to LaVallee. LaVallee testified that he bailed out six local members and "maybe some others," [11] and paid $30,000 to attorney Steve Nelson "to get people out of jail." LaVallee also testified that contributions came in to repay the loan through the end of 1989, but bank records reflected repayment of the loan by November, 1989. He also said that he used his "own money *or the union's money*" (emphasis added) to pay bail money.

While we draw no adverse inferences in this case against LaVallee for his refusal to answer questions based on a claimed Fifth Amendment privilege, "the Fifth Amendment does not forbid adverse inference against parties to civil actions when they refuse to testify in response to probative evidence offered against them" (citing *Baker v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976)). *See Cerro Gordo Charity v. Fireman's Fund American Life Ins. Co.*, 819 F.2d 1471, 1480 (8th Cir.1987).

Contrary to the Board, we think it irrelevant to observe that local members were merely exercising a "legal constitutional right" to obtain bail and legal assistance. The Board's reliance on this red herring led it to infer that LaVallee's assistance to the local members was not "condonation or ratification by the [local] of the alleged misconduct." Just because the members' individual exercise of legal or constitutional rights may

10. LaVallee discussed with Anderson, before she testified, the unfair labor practice charges against the union and the local's position with regard to these charges. We find it difficult to credit Anderson's testimony about contributions before September 9 and LaVallee's denial of any contributions before that date. What is important on the issue of ratification, however, is the making and handling of the union members' collection after the riot.

11. Among those on whose behalf LaVallee acted was Don Miller, the suspended or former local member who was on the bus trip.

have been involved does not mean that the local, by contributing and taking collective action through LaVallee to bring about their release, did not condone or ratify their underlying conduct. The Board's rationale flies in the face of the *Gibbs* decision (and its progeny) dealing with the principles of agency.

We construe the Board's rationale to be that even if violent acts and rioting were the bases for arrest of members, and even if the local members had been involved in assisting and aiding unsanctioned violent activity outside the local's jurisdiction, and even if the local's chief officer were spending the time and money of the local in pursuing release of these members *and others* a substantial distance away from the local's territory, that there could be no ratification or condonation since those arrested were "presumptively innocent" of the charges. The Board failed to note that there was never any disavowal by LaVallee or the local of the riotous conduct even after guilt was clear and admitted. The local agent's conduct in assisting those who had engaged in unsanctioned activity (regardless of ultimate guilty pleas) and his conduct throughout in opposing BE & K speak louder than his words. The attempt to hide the local's participation and approval by keeping no record of contributions and characterizing the loan as merely personal also point to ratification within the meaning of *McGraw–Edison.* There was also evidence to indicate actual participation or instigating activity in the wrongful conduct on the part of the local.

The Board failed to note also that the local had *no duty* to involve itself in assisting individual members in conduct of this kind. LaVallee was a volunteer on the scene attempting to provide legal assistance for a number of persons arrested at the scene of the riot some 400 miles distant from the principal project in which the local was engaged.

The substantial circumstantial and direct evidence of condonation and ratification de-

tracts strongly from "the weight of the decision" by the Board. *Schnuck Markets,* 961 F.2d at 704. If it be true that "circumstantial evidence standing alone may sustain a [criminal] conviction so long as the totality of the evidence was substantial enough," [12] then such evidence in a civil proceeding may be sufficient to overcome the acceptance by the ALJ of LaVallee's testimony.[13] The ALJ's acceptance of LaVallee's testimony was misguided. We note that LaVallee invoked his Fifth Amendment privilege based upon advice from an attorney who represented both the local and LaVallee personally.

Among the other circumstantial evidence that must be taken into account is testimony indicating that the gathering of union adherents at International Falls on September 9 (the local members being in the vanguard) was obviously planned and organized. Most of those present, like the group from Iron Mountain, Michigan, came from a distance and were not International Falls people. There was longstanding hostility and animosity towards BE & K by LaVallee and his fellow union chiefs in the upper peninsula-Minnesota area. There was pervasive rumor and expectation of a "watershed event" on September 9. LaVallee favored active assistance of Minnesota unions by the local. There was never any expression of disapproval by LaVallee or the local of extended violent activity against BE & K (or Boise Cascade). LaVallee's presence in Minnesota, along with the strong inference of local support and approval, in conjunction with post-riot assistance to those engaged in the supposed unauthorized conduct, including both local members and others associated with them, showed condonation and approval of these actions.

There was no proof that LaVallee or the local had any direct business relationship at International Falls; there was no showing of any duty whatever imposed upon LaVallee to undertake this post-riot sustained activity in Minnesota. Nor was there any legal right of the arrested persons, local members or oth-

---

**12.** *See United States v. Phibbs,* 999 F.2d 1053, 1064 (6th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1070, 127 L.Ed.2d 389 (1994).

**13.** The ALJ acknowledged "a painstakingly-mounted collection of circumstantial evidence" presented by the General Counsel.

ers, to receive financial help from the union's contributions (or from the loan) for bail, legal fees, or fines. There was direct proof of local post-riot contributions to support La-Vallee in his post-riot activity and that the bank intended to make the loan to or for the benefit of the local rather than for LaVallee personally. The strong weight of all this evidence cannot be disregarded by giving credibility to LaVallee's hearing testimony and refusing to draw obvious inferences from the evidence herein discussed. The degree of support LaVallee provided to the incarcerated local members, in conjunction with the financial and moral support he received in his endeavors, showed his apparent, if not actual, authority to act on the union's behalf in its ratification of the unlawful acts.

Because the strong and convincing proof in this case demonstrates condonation and ratification by the local under longstanding agency principles, we conclude that the local is guilty of the unfair labor practice charges made against it. This proof is buttressed by evidence that the local, through its agent LaVallee, also actively participated or assisted in violent acts against BE & K, its employees, and subcontractors. We make no finding, however, that the ALJ erred in his somewhat ambivalent conclusions about the local's actual participation.

Accordingly, we **REVERSE** the decision and order of the Board and **REMAND** to the Board for further proceedings consistent with our opinion in this case.